929 F.2d 801
 Robert BRENNAN and Joanne Brennan, Plaintiffs, Appellees,
v.
CARVEL CORPORATION and Raymond Urezzio, Defendants, Appellants.
Robert BRENNAN and Joanne Brennan, Plaintiffs, Appellants,
v.
CARVEL CORPORATION and Raymond Urezzio, Defendants, Appellees.
 Nos. 90-1077, 90-1118.
 United States Court of Appeals,
First Circuit.
 Heard July 30, 1990.
Decided March 29, 1991.
 
 Robert L. Weigel with whom Haya M. Handel, Gibson, Dunn & Crutcher, New York City, John M. Reed, David A. Guberman, Barbara O'Donnell, and Sherin and Lodgen, Boston, Mass., were on brief, for defendants.
 John C. Martland with whom Harold Brown, L. Michael Hankes and Law Offices of Harold Brown, Boston, Mass., were on brief, for plaintiffs.
 Before CAMPBELL and TORRUELLA, Circuit Judges, and RE,* Judge.
 RE, Chief Judge:
 
 
 1
 In this diversity action, defendants-appellants, the Carvel Corporation and Raymond Urezzio (collectively "Carvel"), appeal from a judgment of the United States District Court for the District of Massachusetts which granted plaintiffs-appellees, Robert and Joanne Brennan (the Brennans), $780,406.70 for breach of contract. The Brennans cross-appeal from the district court's judgment denying them recovery under the Massachusetts unfair trade practices statute. See Mass.Gen.L. ch. 93A, Sec. 2 (1985).
 
 
 2
 On appeal, Carvel contends that the district court, after a bench trial, erred in determining that Carvel was liable for breach of a contract entered into between the Brennans and Carvel prior to the finalization of their franchise agreement. Pursuant to the contract, Carvel agreed to evaluate and approve a suitable location for an ice cream store for the Brennans. Carvel contends that the Application and Deposit Agreement for Carvel Retail Manufacturer's License (the deposit agreement) was not a separate and enforceable contract since the franchise agreement subsequently entered into by the parties, the Carvel Retail Manufacturer's License, contained a merger clause which stated that the franchise agreement contains the entire agreement between the parties.
 
 
 3
 Alternatively, Carvel argues that, if the court finds that the deposit agreement constituted a separate contract, under the principles of waiver and estoppel, the Brennans are not entitled to damages for breach of contract. Carvel also contends that the district court's finding of fact that Carvel breached the contract was clearly erroneous. Finally, Carvel contends that the district court erred in granting the Brennans reliance damages.
 
 
 4
 The Brennans, on their cross-appeal, contend that the district court erred in denying their claim for damages under the Massachusetts unfair trade practices statute.
 
 
 5
 The first question presented on Carvel's appeal is whether the district court erred in concluding that, notwithstanding the merger clause contained in the franchise agreement, the deposit agreement constituted a separate and enforceable contract. Since we conclude that the district court did not err in determining that the deposit agreement constituted a separate and enforceable contract, we must consider whether, under the circumstances, the Brennans either waived or are estopped from asserting their rights under the contract, and whether the district court's finding of fact that Carvel breached the contract was clearly erroneous. We must also consider whether the district court erred in granting the Brennans reliance damages.
 
 
 6
 The question presented on the Brennans' cross-appeal is whether the district court erred in denying the Brennans' claim for damages under the Massachusetts unfair trade practices statute.
 
 
 7
 On Carvel's appeal, we conclude that the Brennans neither waived nor are they estopped from asserting their rights under the contract, and that the district court's finding that Carvel breached the contract was not clearly erroneous. We also conclude that the district court did not err in granting the Brennans reliance damages.
 
 
 8
 Since we conclude, however, that it was error to enter judgment against Urezzio individually, the district court's entry of judgment against him is reversed. As to the cross-appeal, we conclude that the district court did not err in denying the Brennans their claim for damages under the Massachusetts unfair trade practices statute. Hence, the judgment of the district court is affirmed in part and reversed in part.
 
 BACKGROUND
 
 9
 This diversity case for breach of contract arises out of a franchise relationship, entered into in 1977 between the franchisees, Robert and Joanne Brennan (the Brennans) and the franchisor, the Carvel Corporation, for an ice cream store located in Boston, Massachusetts.
 
 
 10
 According to the testimony at trial, in 1977, the Brennans, who were interested in operating their own business, responded to a newspaper advertisement describing Carvel franchise opportunities. In response to the Brennans' inquiries, Carvel scheduled a meeting for them with Richard Monaco, an assistant to Carvel's vice president and sales manager Raymond Urezzio. On April 24, 1977, at a Carvel store in Brookline, Massachusetts, the Brennans met with Monaco, who gave the Brennans a Carvel informational brochure and a Carvel disclosure statement.
 
 
 11
 The Carvel informational brochure described the history of the Carvel Corporation, and provided an overview of Carvel operations. The brochure stated that "Carvel employs its own Real Estate location experts ... dedicated to help its owner-operators succeed in their stores." The brochure invited persons who were interested in becoming Carvel franchisees to contact Carvel for an interview. The disclosure statement, which was also given to the Brennans by Monaco at the meeting, stated in paragraph 11 that:
 
 
 12
 Carvel will assume responsibility for selecting, obtaining and negotiating a suitable location for the Carvel Store. When a location has been approved, Carvel will negotiate a rental arrangement, prepare and approve lease documents, and handle the closing and signing of the lease. A one time real estate fee of $2,500.00 is paid by the Licensee.
 
 
 13
 Paragraph 23 of the disclosure statement provided that:
 
 
 14
 Earnings and/or profits, if any, of a Carvel Store are the responsibility of the licensee and no representations or statements of projected earnings or profits are made to Licensees with respect to Carvel retail manufacturing stores. Neither officers nor employees of the Company are authorized to make any claims or statements as to the prospects or chances of success that any Licensee can expect or that past Licensees have had ... CARVEL WILL NOT BE BOUND BY ANY REPRESENTATIONS AS TO SUCCESS OR FAILURE AND AFFIRMS THAT A CARVEL STORE AND BUSINESS CAN FAIL.
 
 
 15
 (emphasis in original).
 
 
 16
 The testimony at trial further revealed that the Brennans, on May 21, 1977, again met with Monaco at the Brookline Carvel store. At the May 21 meeting, the Brennans gave Monaco a $1,000 deposit on a Carvel franchise, and the Brennans and Carvel entered into a deposit agreement. The deposit agreement, which was attached to the Carvel disclosure statement, was entitled Application and Deposit Agreement for Carvel Retail Manufacturer's License. The deposit agreement stated that "[t]he Applicant understands that, in reliance upon this application, a substantial amount of time and effort shall be exerted in seeking, surveying and showing locations suitable for a Carvel Store...." The deposit agreement also stated that:
 
 
 17
 In consideration of the services to be rendered to the Applicant hereunder, the Applicant agrees not to disclose or to make use of ... any trade secrets or information disclosed to [the Applicant] in reliance upon this application, including, but not limited to, contemplated locations for Carvel Stores, methods of financing, sources of supply, merchandising techniques and operating methods. It is intended that this clause shall be effective whether or not a Carvel Retail Manufacturer's License is entered into between the parties.
 
 
 18
 At the May 21 meeting, the Brennans told Monaco that they knew of available retail space where an ice cream store might be located. The Brennans' proposed site, at 195 State Street in Boston, Massachusetts, was owned by their lawyer, Walter McLaughlin. Monaco stated that he would not approve a location for the Carvel franchise until the proposed site was "studied, evaluated and approved" by Carvel. The Brennans continued to look at other possible locations for their Carvel store.
 
 
 19
 On July 16, 1977, the Brennans met at the 195 State Street location with Monaco, Urezzio, and Walter McLaughlin. At the meeting, Urezzio approved the 195 State Street location and, according to the testimony of the Brennans, stated that "everything checks out; the site appears to be okay; and ... he had never approved a site which had failed...."
 
 
 20
 There is evidence in the record that, at the time that Urezzio approved the 195 State Street site, he did not believe that the store could succeed on foot traffic alone, and instead believed that the Brennans would have to generate additional business in the form of office and institutional (O and I) sales. At trial, Urezzio was subject to cross-examination on the basis of his pre-trial deposition. During the deposition, he stated that the 195 State Street site had insufficient foot traffic to succeed as a Carvel store. In addition, the evidence presented at trial established that most Carvel stores were in suburban locations, and that 70% of the sales of a typical Carvel franchise were take-home sales. The 195 State Street site was located in downtown Boston, and, hence, was not well suited to take-home sales of ice cream.
 
 
 21
 Carvel's written survey for the 195 State Street site was not completed until after the July 16, 1977, meeting. The written survey, as prepared by Monaco, was inaccurate as to the location of the site in relation to other streets and landmarks, and also relied on outdated information. Additionally, Monaco, who was employed by Carvel in New York, had not previously been involved in a Massachusetts site selection.
 
 
 22
 On October 28, 1977, the Brennans, accompanied by their lawyer, McLaughlin, in Yonkers, New York, attended the closing for their store. At the closing, the Brennans and Carvel entered into a franchise agreement, entitled the Carvel Retail Manufacturer's License. The franchise agreement contained a merger clause in paragraph 27, which stated that:
 
 
 23
 This Agreement contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and no representations or warranties are made or implied, except as specifically set forth herein. This Agreement cannot be changed or terminated orally.
 
 
 24
 The franchise agreement, in paragraph 34, contained a statement repeating Carvel's disclaimer of any guarantee of success. A separate disclaimer statement was signed by the Brennans, in which the Brennans agreed:
 
 
 25
 That neither Carvel sales personnel or any other officer or employee of Carvel are authorized (and indeed they are specifically directed) not to make any claims or statements as to the prospects or chances of success that this licensee can expect or that past licensees have had. This will acknowledge that no assurances of success are intended or implied by Carvel Corporation ... [and] ... [t]hat Carvel will not be bound by any unauthorized representations as to success.
 
 
 26
 At the closing, the Brennans also signed several Carvel sales contracts. One of the sales contracts assessed against the Brennans a $2,500 real estate services fee. Neither the franchise agreement nor the sales contracts contained any description of the real estate services that were provided.
 
 
 27
 The Brennans testified that they worked very hard at making the business a success. Robert Brennan testified that he worked seven days a week, often for sixteen hours a day, and that Joanne Brennan, who worked full time elsewhere, also contributed time and effort to the store. They participated in many Carvel promotions. Additionally, they pursued O and I sales and, by the time of the store's closing, had obtained over thirty O and I accounts. The evidence presented at trial indicated that while these efforts helped their business, the promotions and other efforts did not generate enough income to make the Carvel store successful.
 
 
 28
 In 1980, the Brennans closed their store. In 1981, the Brennans brought suit against Carvel and Raymond Urezzio, Carvel's vice president and sales manager, for breach of contract, breach of the covenant of good faith and fair dealing, fraud and deceit, and promissory or equitable estoppel. The Brennans also brought a statutory cause of action for unfair and deceptive acts and practices, under the Massachusetts unfair trade practices statute, codified at Mass.Gen.L. ch. 93A (1985).
 
 
 29
 The case was tried without a jury. At the close of the trial, the district court entered judgment in favor of the Brennans on the breach of contract claim, and granted the Brennans $780,406.70. The court, however, entered judgment in favor of Carvel on all other claims.
 
 
 30
 In its conclusions of law on the breach of contract claim, the district court stated that "[t]he Application and Deposit Agreement between Carvel and the Brennans constituted a separate, enforceable contract[,]" and that Carvel "breached the Application and Deposit Agreement by failing to properly and adequately select, evaluate and approve a suitable location for an average Carvel ice cream store." See Brennan v. Carvel Corp., No. 810595-N, slip op. at 18 (D.Mass. July 25, 1989).
 
 
 31
 The district court denied the Brennans' statutory cause of action, since "[t]he Brennans have not shown that Carvel's failure to perform under the Application Agreement constituted conduct that attain[ed] 'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " Id. at 22 (quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979)).
 
 DISCUSSION
 
 32
 This case was decided by the district court under Massachusetts law. The franchise agreement, however, contains a choice of law provision that states that "any and all performance [under this contract], or breach thereof shall be interpreted, governed and construed pursuant to the laws of the State of New York...." The contract found to exist by the district court in this case, however, is separate and independent from the franchise agreement. Therefore, the choice of law provision of the franchise agreement does not apply.
 
 
 33
 In diversity cases, federal courts must apply the choice of law rules of the state in which the court sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). As we noted in Bi-Rite Enterprises, Inc. v. Bruce Miner Co., 757 F.2d 440, 442 (1st Cir.1985), in Massachusetts, the court must apply the law of the state with the "most significant relationship" with the suit.
 
 
 34
 In this case, it is clear that Massachusetts has the "most significant relationship" with the case. The deposit agreement was entered into in Massachusetts, and pertained to a store located in Massachusetts. Accordingly, the district court was correct in applying Massachusetts law.
 
 I. Standard of Review
 
 35
 Rule 52(a) of the Federal Rules of Civil Procedure states that in non-jury trials, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." It is well to note, however, that the deference to be accorded a trial court's findings of fact in a non-jury trial is not based solely on the district court's determinations of credibility. See Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). Indeed, "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Id.
 
 
 36
 In Anderson, the Supreme Court noted that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74, 105 S.Ct. at 1511. On appeal, a finding of fact is " 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. at 573, 105 S.Ct. at 1511 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948)).
 
 II. Carvel's Appeal--Breach of Contract
 A. Liability
 1. Integration
 
 37
 Carvel asserts that the franchise agreement entered into between the Brennans and Carvel "was an integrated contract into which all prior agreements between the parties merged and therefore, as a matter of law, any prior contractual duty which Carvel had to find the Brennans a suitable site was discharged."
 
 
 38
 It is well established, under the parol evidence rule, that "[a] binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them." Restatement (Second) of Contracts Sec. 213(1) (1981). Nevertheless, the parol evidence rule does not apply to a collateral agreement, i.e., a separate contract between the same parties. See id. at Sec. 216.
 
 
 39
 The "collateral agreement rule" is well established in Massachusetts. In Durkin v. Cobleigh, 156 Mass. 108, 30 N.E. 474 (1892), the plaintiff purchased certain real property from the defendant. The deed to the real property did not contain any covenants requiring the defendant to build a street or to provide water service to the property. Plaintiff sued for breach of contract, contending that "in order to induce him to buy the lot, the defendant orally promised to grade and build the street so as to connect with a certain public street already built and open, and also to cause the city water to be put into the street by a certain specified time." Id. at 108-09, 30 N.E. at 474. The trial court granted a directed verdict to the defendant, and the plaintiff appealed to the Supreme Judicial Court of Massachusetts.
 
 
 40
 The Supreme Judicial Court stated that "[a] rule has been established which may be stated in general terms to be that an agreement by parol, which is collateral to the written contract and on a distinct subject, may be proved." Id. at 109, 30 N.E. at 474. The court added that:
 
 
 41
 "The existence of any separate oral agreement as to any matter on which a document is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties did not intend the document to be a complete and final statement of the whole transaction between them," may be proved.
 
 
 42
 Id. (quoting Steph.Dig.Evid. (Amer.Ed.) 163). The court concluded that the oral agreement to build the street and connect the property to a water line may have constituted a collateral agreement, and, hence, reversed the trial court's directed verdict for the defendant.
 
 
 43
 Similarly, in Williams v. Pittsfield Lime & Stone Co., 258 Mass. 65, 154 N.E. 572 (1927), the Supreme Judicial Court of Massachusetts stated that:
 
 
 44
 an independent and collateral element of a contract may be shown by parol evidence, even though the rest of the contract is in writing ..., notwithstanding the general rule that, when the parties have reduced their contract to writing, all previous or contemporaneous oral or written negotiations are merged in it and its terms cannot be varied, contradicted, added to, or subtracted from....
 
 
 45
 Id. at 68, 154 N.E. at 573-74.
 
 
 46
 The collateral agreement rule is discussed in many treatises that indicate that the rule is based on the principle that "[t]he fact that an agreement is completely integrated does not, of course, affect an attempt to show an entirely separate and distinct agreement between the same parties." 2 E. Farnsworth, Contracts Sec. 7.3 at 207 (1990). See also Restatement (Second) of Contracts Sec. 216 comment c (1979). According to Wigmore, since application of the collateral agreement rule involves a determination of the intent of the parties in entering into the contract, prior cases have little precedential value. See 9 J. Wigmore, Evidence Sec. 2442 at 145 (1981) (citation omitted). Hence, "[t]he application of the rule should in almost all instances be left to the trial judge's determination." Id. at 146.
 
 
 47
 It is pertinent to note that, under Massachusetts law, the determination of whether a contract is completely or partially integrated, or whether a second contract is collateral to an integrated agreement, is a question of fact to be decided in the first instance by the trial judge. See Alexander v. Snell, 12 Mass.App.Ct. 323, 324, 424 N.E.2d 262, 264 (1981); Wang Laboratories, Inc. v. Docktor Pet Centers, Inc., 12 Mass.App.Ct. 213, 220, 422 N.E.2d 805, 809 (1981). As previously stated, the trial judge's findings of fact will not be reversed unless they are clearly erroneous.
 
 
 48
 In this case, a review of the evidence presented at trial indicates that the district court's finding as to the collateral agreement was not clearly erroneous. That the deposit agreement entered into by the Brennans and Carvel, and Carvel's promise to select, evaluate and approve a suitable site for the Brennan's ice cream store constituted a separate contract, or an agreement collateral to the franchise agreement, may be shown by an examination of the deposit agreement. The deposit agreement expressly stated that Carvel would expend "a substantial amount of time and effort" in seeking a suitable location for the Brennans' ice cream store. The deposit agreement also required that the Brennans not disclose any trade secrets or information regarding potential sites received during this process.
 
 
 49
 Furthermore, evidence that the Brennans and Carvel intended to form a separate contract requiring Carvel to select, evaluate, and approve a suitable site or location for the Brennans' ice cream store may be found from other materials. For example, Carvel's informational brochure, which was given to the Brennans at their first meeting with a Carvel representative and prior to the formation of the deposit agreement, stated that Carvel employed "Real Estate location experts," who were "dedicated to help its owner-operators succeed in their stores." The disclosure statement specifically stated that Carvel would "assume responsibility for selecting, obtaining and negotiating a suitable location for the Carvel Store." In addition, the sales contract assessed against the Brennans a $2,500 fee for real estate services, but did not describe the services provided.
 
 
 50
 Carvel, nonetheless, argues that any prior contract entered into between the Brennans and Carvel was discharged by the franchise agreement. In support of its argument, Carvel cites the merger clause of the franchise agreement, which expressly provides that "all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and no representations or warranties are made or implied, except as specifically set forth herein."
 
 
 51
 The merger clause of the franchise agreement reflects the general rule of contract law that "when the parties have reduced their contract to writing, all previous or contemporaneous oral or written negotiations are merged in it and its terms cannot be varied, contradicted, added to, or subtracted from by oral testimony touching such negotiations." Williams, 258 Mass. at 68-69, 154 N.E. at 574. The determination of whether the franchise agreement is an integrated contract, and whether all prior agreements are merged into it, is governed by the intent of the parties. See Durkin, 156 Mass. at 109, 30 N.E. at 474.
 
 
 52
 In order to determine the intent of the parties, a court may not consider extrinsic evidence offered to contradict the written terms of the contract; however, a court may consider extrinsic evidence "for the purpose of elucidating" the terms of the contract. Keating v. Stadium Management Corp., 24 Mass.App.Ct. 246, 249-50, 508 N.E.2d 121, 123 (1987). Here, a review of the evidence indicates that, notwithstanding the existence of the merger clause contained in the franchise agreement, the district court was not clearly erroneous in concluding that the Brennans and Carvel did not intend that the franchise agreement constitute the entire agreement between them.
 
 
 53
 The franchise agreement contains no references to site selection or real estate services. Furthermore, in the sales contract the Brennans were charged $2,500 for "Real Estate services." The deposit agreement also stated that "[i]n consideration of the services to be rendered to the Applicant," the Brennans would not disclose any confidential Carvel information revealed to them. Hence, it is clear that the deposit agreement itself had a consideration separate and apart from the consideration of the franchise agreement. Moreover, the confidentiality clause of the deposit agreement states that "[t]his clause shall be effective whether or not a Carvel Retail Manufacturer's License is entered into between the parties." This statement suggests that the parties intended at least certain obligations established under the site location agreement to continue, notwithstanding their entry into the franchise agreement.[1]
 
 
 54
 Hence, we conclude that the finding of the district court, that the Brennans and Carvel had entered into a separate contract collateral to the franchise agreement in which Carvel promised to select, evaluate, and approve a suitable location for the Brennans' ice cream store, was not clearly erroneous.
 
 2. Breach of Contract
 
 55
 Carvel contends that, even if the Brennans and Carvel had entered into a separate and enforceable contract for the selection, evaluation, and approval of a suitable site, Carvel had not breached that contract since "the district court's determination that the site was not suitable was clearly erroneous."
 
 
 56
 In support of its contention, Carvel asserts that a suitable location or site is one that "is properly zoned, has the necessary electrical and mechanical facilities to operate a Carvel ice cream store, and ... has enough space to house both the factory facility and retail sales."
 
 
 57
 We disagree with Carvel's interpretation of the deposit agreement. It seems illogical and unrealistic that Carvel would require confidentiality for "trade secrets or information" regarding potential sites for Carvel franchises if the only requirements for a suitable site were that it be properly zoned and have adequate electricity, water, and sewage facilities. A review of the evidence presented at trial indicates that, under the circumstances, a "suitable site" means one that is in a location which has adequate traffic or population, or other appropriate characteristics, in which a Carvel franchise may succeed.
 
 
 58
 We distinguish, as did the district court, the selection, evaluation and approval of a "suitable site," and a guarantee of success. The district court found that "[t]he Brennans understood ... that no Carvel representative had any authority to make representations concerning their business revenues and that they could not rely on any such representations apart from those in the Carvel License." Brennan, slip op. at 15. The record supports the conclusion that the Brennans knew that a Carvel franchise could fail. Nevertheless, Carvel contracted to approve a "suitable site." In its informational brochure, Carvel stated that it employed "Real Estate location experts" and, in the deposit agreement, Carvel stated that "a substantial amount of time and effort" would be used in selecting a suitable site. Additionally, the sales contract provided that the Brennans must pay a $2,500 fee for real estate services to Carvel.
 
 
 59
 The testimony also reveals that the statements of Carvel's representatives, Richard Monaco and Raymond Urezzio, support the district court's interpretation of "a suitable location." Robert Brennan testified that at the May 21, 1977 meeting, "Mr. Monaco stated that any site had to be studied, evaluated and approved by Carvel before it could be accepted." Mr. Brennan further testified that Mr. Monaco said "he would have to ... study and collect the information and ... evaluate the potential for the particular location." The statements made by Carvel's representatives to the Brennans must be considered in the context of the relationship between the parties. The Brennans clearly believed that Carvel's representatives had specific and expert knowledge about what constituted an appropriate or "suitable" site for a Carvel franchise.
 
 
 60
 Hence, we conclude that the district court did not err in its interpretation of a "suitable site."
 
 
 61
 Based upon its interpretation of a "suitable site," the district court was not clearly erroneous in concluding that Carvel breached the contract. The district court, in its findings of fact, expressly found that the 195 State Street site was not a suitable location for a Carvel store. The court concluded that there was insufficient foot traffic at the 195 State Street site and, to succeed, the Brennans would have had to make the majority of their business O and I sales. The court also concluded that Carvel's operations were not primarily directed towards O and I sales. Finally, the court found credible the testimony that the Brennans had worked hard at their ice cream store, and that the store's failure was not attributable to any lack of effort or mismanagement.
 
 
 62
 It is clear that the evidence presented at trial supports the district court's findings of fact in support of its conclusion that Carvel breached its contract to select, evaluate, and approve a suitable location for the Brennans' ice cream store. Hence, we cannot conclude that the district court's findings of fact were clearly erroneous.
 
 3. Estoppel and Waiver
 
 63
 Carvel contends that "the principles of waiver and estoppel bar the Brennans' claims against Carvel."
 
 
 64
 In support of its contention, Carvel submits that the Brennans, who had initially mentioned the 195 State Street site, knew many of the shortcomings of the site in advance. Carvel also notes that the Brennans had been told by their attorney, prior to entering into the franchise agreement, that he did not believe that Carvel had earned their $2,500 fee for real estate services.
 
 
 65
 Under Massachusetts law, the burden of proving waiver is upon the party who makes the assertion. See Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir.1988). In order to establish waiver, the party must show " 'clear, decisive and unequivocal conduct' " indicating that the opposing party would not insist that the contractual provision at issue be performed. Id. (quoting Glynn v. City of Gloucester, 9 Mass.App.Ct. 454, 462, 401 N.E.2d 886, 892 (1980)).
 
 
 66
 It is evident that, under the standard established by Massachusetts law, Carvel has not shown that the Brennans waived their rights as to the contract provision requiring Carvel to select, evaluate, and approve a suitable site for their ice cream store. Indeed, the evidence indicates that the Brennans, who met with Mr. Monaco and Mr. Urezzio at the 195 State Street site, sought Carvel's approval for the site. Mr. Brennan testified that Mr. Urezzio's approval was "extremely important to us," and "gave us confidence in the fact that he is saying that the site is approved...."
 
 
 67
 In essence, estoppel requires that a party who makes a representation of fact cannot later deny that fact, if the opposing party justifiably relied upon the representation. See 1 S. Williston, Contracts Sec. 139 at 601-02 (3d ed. 1957). Since the Brennans never stated that the 195 State Street site was "suitable" and sought Carvel's approval, and since they continued to investigate other potential sites, it is clear that they are not estopped from asserting their rights under the contract.
 
 
 68
 Hence, we conclude that the Brennans did not waive their right to assert, nor are they estopped from asserting, that Carvel failed to approve a "suitable site" for the Brennans' ice cream store.
 
 4. Liability of Urezzio
 
 69
 The district court entered judgment in favor of the Brennans, and against both Carvel and Urezzio. The Brennans assert that the judgment against Urezzio is supported by "principles of agency or causation." Under Massachusetts law, however, unless the parties have otherwise agreed, an agent entering into a contract on behalf of a disclosed principal does not become individually liable on the contract. See Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 993 (1st Cir.1988); Restatement (Second) of Agency Sec. 328 (1958). Since there is no evidence in the record that the parties intended to make Urezzio individually liable on the contract, we conclude that the district court erred in entering judgment against Urezzio individually. Accordingly, we reverse the district court's entry of judgment against Urezzio.
 
 B. Damages
 
 70
 Carvel also contends that the district court erred in awarding the Brennans reliance damages.
 
 
 71
 It is fundamental that, in a breach of contract action, the court should grant damages to the injured party in an amount sufficient to compensate for the loss, "and to put [the injured party] in as good a position financially as [the party] would be in had there been no breach." See F.A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 411, 32 N.E.2d 237, 240 (1941). See also Abrams v. Reynolds Metals Co., 340 Mass. 704, 708, 166 N.E.2d 204, 207 (1960). Contract damages may be measured by the injured party's "reliance interest," which may include "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts Sec. 349 (1981). Damages based on the injured party's reliance interest are often granted when the party's damages based on lost expectations are uncertain or cannot be measured. See id. at comment a. See also, e.g., Sullivan v. O'Connor, 363 Mass. 579, 586, 296 N.E.2d 183, 188 (1973). In granting the Brennans reliance damages, the district court noted that, in cases where damages are suffered by a business, lost profits are often too uncertain to measure. See Brennan, slip op. at 28. The court added that the Brennans "have not proffered evidence of loss of actual profits expected in the enterprise and hence, this court cannot grant expectation damages." Id.
 
 
 72
 Carvel, however, asserts that the Brennans are not entitled to reliance damages because, prior to the formation of the franchise agreement, the Brennans knew of Carvel's breach from the statement of their attorney that, in his opinion, Carvel had not earned its fee for real estate services. Carvel states that "[r]eliance damages cannot be awarded for expenditures made after knowledge of a breach, because such expenditures are not made 'in reliance' on defendant's promises."
 
 
 73
 We disagree. Under the circumstances, it would seem clear that McLaughlin's statement to the Brennans does not constitute knowledge, on their part, of Carvel's breach. Hence, we conclude that the district court did not err in granting the Brennans reliance damages.
 
 
 74
 III. The Brennans' Cross-Appeal--Unfair Trade Practices
 
 
 75
 On their cross-appeal, the Brennans contend that they are entitled to damages under their statutory claim for unfair trade practices. They assert that, in failing to disclose to the Brennans that the 195 State Street site was not a suitable location for a Carvel ice cream store, Carvel committed a per se violation of section 2 of the Massachusetts unfair trade practices statute.
 
 
 76
 Section 2 of the Massachusetts unfair trade practices statute, which is also known as the "Massachusetts Little FTC Act," provides that:
 
 
 77
 (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
 
 
 78
 (b) It is the intent of the legislature that in construing paragraph (a) of this section ..., the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
 
 
 79
 (c) The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.
 
 
 80
 Mass.Gen.L. ch. 93A, Sec. 2 (1985). Section 11 of chapter 93A grants a cause of action to persons engaged in commerce who suffer a loss because of the unfair acts or practices of another person engaged in commerce. See Mass.Gen.L. ch. 93A, Sec. 11 (Supp.1990). Under section 11, the court may award a plaintiff up to treble damages.
 
 
 81
 The Brennans argue that Carvel's liability is based on a regulation issued by the Massachusetts attorney general, under section 2(c) of chapter 93A. The applicable regulation of the attorney general states that:Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c. 93A, s. 2 if:
 
 
 82
 . . . . .
 
 
 83
 (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction....
 
 
 84
 Mass.Regs.Code tit. 940, Sec. 3.16(2). If valid, the attorney general's regulations pursuant to section 2(c) of chapter 93A have the "force of law." See Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 775, 407 N.E.2d 297, 306 (1980).
 
 
 85
 The Brennans contend that Carvel failed to disclose to them a material fact, in violation of Mass.Regs.Code tit. 940, Sec. 3.16(2), by not informing them that there was insufficient foot traffic, at the 195 State Street site, for a Carvel franchise to succeed. In support of their contention, the Brennans note that, based on Urezzio's testimony at trial and in a pre-trial deposition, the district court expressly found that, at the time that he approved the site, Urezzio did not believe that there was sufficient foot traffic at the 195 State Street site for a Carvel franchise to succeed. The district court also expressly found that Urezzio believed that the Brennans would have to obtain many O and I accounts to succeed. The Brennans also note that the evidence at trial established that no Carvel stores had a substantial amount of O and I sales, that Carvel's operations were not directed towards O and I sales, and that suggested sites for Carvel stores were not approved on the basis of their potential for O and I sales. Finally, the Brennans cite the testimony of Joseph Hoffman, a Carvel sales agent for the Eastern Massachusetts area, who testified at trial that, prior to approval of the 195 State Street site, he expressed doubt to Urezzio that the site was the best potential location for a Carvel store in that area.
 
 
 86
 In addition, apart from specific liability under the attorney general's regulation, the Brennans assert generally that Carvel has committed "unfair or deceptive acts or practices" in violation of chapter 93A. We note that an act is "deceptive" under chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." Lowell Gas Co. v. Attorney General, 377 Mass. 37, 51, 385 N.E.2d 240, 249 (1979).
 
 
 87
 In support of their contention, the Brennans cite certain conduct in addition to Carvel's approval of the 195 State Street site. The Brennans contend that Carvel, in its promotional material, misrepresented certain facts. Specifically, the Brennans cite Carvel's statement in its informational brochure and sales contracts that its ice cream freezer and assembly plates were patented, without revealing to the Brennans that the patents had expired. The Brennans also point out Carvel's statement in its informational brochure that it employed "Real Estate location experts," when the evidence at trial established that the Carvel representatives involved in the approval of the 195 State Street site did not possess any special real estate training.
 
 
 88
 Additionally, the Brennans cite Carvel's " 'stringing along' the Brennans concerning the relocation of their store from 195 State Street to a suitable location and in their demanding the execution of a general release before authorizing a transfer." The Brennans also note Carvel's filing of a counterclaim, against the Brennans, for royalty and advertising payments due on the balance of the Brennans' eight year franchise agreement. The district court had dismissed the counterclaim, noting that Carvel's material breach of contract excused the Brennans from any further payments. See Brennan, slip op. at 32.
 
 
 89
 Despite the evidence submitted by the Brennans on their chapter 93A claim, it is important to note that chapter 93A " 'does not contemplate an overly precious standard of ethical or moral behavior. It is the standard of the commercial market place.' " USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 124, 546 N.E.2d 888, 897 (1989) (quoting Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679, 497 N.E.2d 19, 23, review denied, 398 Mass. 1105, 499 N.E.2d 298 (1986)), review denied, 406 Mass. 1104, 550 N.E.2d 396 (1990). Furthermore, whether a party has committed an unfair or deceptive act, within the meaning of chapter 93A, is a question of fact. See USM Corp., 28 Mass.App.Ct. at 124, 546 N.E.2d at 897.
 
 
 90
 In Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir.1989), we indicated that the standard developed in litigation brought under chapter 93A, known as the rascality standard, is that " '[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " (quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979)). We added in Quaker State that the party bringing a chapter 93A action must establish "that the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury ... to competitors or other businessmen.' " Id. (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915, 917 (1975)).
 
 
 91
 The Brennans, however, submit that "the 'rascality' standard does not apply to acts involving pure deception." They contend that Carvel is subject to "per se" liability for the violation of the attorney general's regulation.
 
 
 92
 In Sheehy v. Lipton Industries, Inc., 24 Mass.App.Ct. 188, 507 N.E.2d 781, review denied, 400 Mass. 1103, 509 N.E.2d 1202 (1987), the plaintiff, the purchaser of certain real property, brought suit against the seller and broker, contending that the defendants failed to disclose that the property had been contaminated by hazardous material. The plaintiff asserted that, in response to the plaintiff's question as to whether the property contained hazardous material, the defendant broker responded " 'Don't worry about it.' " Id. 24 Mass.App.Ct. at 190, 507 N.E.2d at 782. The plaintiff further asserted that, in reliance upon this statement, he purchased the real property. See id. Upon discovering the contamination, the plaintiff brought suit against the defendants on several claims, including a claim under section 11 of chapter 93A. The trial court granted the defendants' motion for summary judgment.
 
 
 93
 The plaintiff appealed, and the Massachusetts Appeals Court reversed and remanded on the chapter 93A claim. The Appeals Court noted that, under Mass.Regs.Code tit. 940, Sec. 3.16(2), the defendants were liable for nondisclosure of a material fact. See id. at 195, 507 N.E.2d at 785. The court added that to recover under the regulation, the plaintiff must establish: "(1) that one or both of the defendants knew that the property was contaminated with hazardous material; (2) that the contamination was a material circumstance which would have led the plaintiff not to purchase the property; and (3) that one or both of the defendants failed to disclose the problem." Id. (footnote omitted). Although the Appeals Court reversed, it made no mention of the "rascality" standard.
 
 
 94
 Similarly, in other cases where a court found chapter 93A liability for violations of Mass.Regs.Code tit. 940, Sec. 3.16(2), no mention was made of the rascality standard. See Sargent v. Koulisas, 29 Mass.App.Ct. 956, 957-58, 560 N.E.2d 569, 571-72 (1990) (appellate court affirms trial court's conclusion that defendant-seller's failure to disclose defects in property constitutes violation of chapter 93A); Homsi v. C.H. Babb Co., 10 Mass.App.Ct. 474, 476-80, 409 N.E.2d 219, 222-24 (1980) (appellate court affirms trial court's conclusion that defendant-seller's failure to disclose material fact constitutes violation of chapter 93A).
 
 
 95
 Regardless of whether the rascality standard applies to the chapter 93A claim against Carvel, it is clear that for Carvel to be liable under chapter 93A, Carvel's conduct must have been more than a mere breach of contract. In this case, there was no "failure to disclose" within the meaning of the cases which involved misleading or deceiving the buyer. Here, the evidence simply indicates that Carvel breached its contract to select, evaluate, and approve a suitable location for the Brennans' ice cream store. There was no evidence that Carvel intended to deceive or mislead the Brennans.
 
 
 96
 As to the Brennans' claim that Carvel is liable under chapter 93A, without regard to the attorney general's regulation, we note that the record fails to support the Brennans' contention that Carvel's breach of contract was so flagrant or deceptive. As stated by the district court in its discussion of the fraud and deceit claims, the Brennans "have shown neither an intent to deceive by [Carvel] nor a lack of reasonable effort in providing a site selection." Brennan, slip op. at 23. We cannot conclude that the record contains evidence of acts so misleading or deceptive as to render the district court's findings on the chapter 93A claim clearly erroneous.
 
 
 97
 It is important to note that the Brennans' action was brought under section 11 of chapter 93A, which grants a cause of action to persons engaged "in the conduct of any trade or commerce...." In contrast, section 9 of chapter 93A grants a cause of action to consumers. As recognized by the Supreme Judicial Court of Massachusetts in Canal Electric Co. v. Westinghouse Electric Corp., 406 Mass. 369, 378, 548 N.E.2d 182, 187-88 (1990), claims brought under section 9 are based on an important public policy, whereas section 11 claims are based primarily on private interests. See also Spence v. Boston Edison Co., 390 Mass. 604, 616, 459 N.E.2d 80, 88 (1983).
 
 
 98
 Hence, we conclude that the district court did not err in denying the Brennans' claim for damages under chapter 93A.
 
 CONCLUSION
 
 99
 We conclude that the deposit agreement entered into by the Brennans and Carvel constituted an enforceable contract, separate from the franchise agreement, and that the Brennans have neither waived nor are they estopped from asserting their rights under the deposit agreement. We also conclude that the district court's finding of fact that Carvel had breached the contract was not clearly erroneous, and that the district court did not err in granting the Brennans reliance damages.
 
 
 100
 We conclude, however, that the district court erred in entering judgment against Urezzio individually, and reverse the district court's entry of judgment against Urezzio. On the Brennans' cross-appeal, we conclude that the district court did not err in denying the Brennans' unfair trade practices claim.
 
 
 101
 Accordingly, the judgment of the district court is affirmed in part and reversed in part.
 
 
 
 *
 The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Apart from the confidentiality clause, the other parts of the contract (location of the site by Carvel and payment of the real estate fee by the Brennans) were to be performed fully by the time the parties entered a franchise agreement