942 F.2d 74
 UNITED STATES of America, Plaintiff, Appellant,
v.
ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES
AND IMPROVEMENTS KNOWN AS 116 EMERSON STREET,
LOCATED IN the CITY OF PROVIDENCE, RHODE
ISLAND, Defendant, Appellee.
 No. 91-1019.
 United States Court of Appeals,
First Circuit.
 Heard May 8, 1991.
Decided Aug. 21, 1991.
 
 Michael P. Iannotti, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief for plaintiff, appellant.
 Vincent A. Indeglia, with whom Edward Romano, Providence, R.I., was on brief, for defendant, appellee.
 Before CAMPBELL and TORRUELLA, Circuit Judges, and BOWNES, Senior Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 The government appeals from a civil forfeiture action, instituted against the defendant property pursuant to 21 U.S.C. § 881(a)(7), in which the owner of record's wife was granted a 50% interest in the property. The government contends that the wife's Rule 24(a)(2) motion to intervene was procedurally deficient, Fed.R.Civ.P. 24(a)(2) (intervention as a matter of right); that she did not demonstrate sufficient ownership rights in the property; and that she failed to prove that she was an "innocent owner." We uphold the district court ruling.
 
 FACTS
 
 2
 The property in question, 116 Emerson Street, Providence, Rhode Island, was deeded to Esteban Colon by its previous owner on December 19, 1979. The price of the property was $16,000. Esteban made an $8,000 down payment from worker's compensation funds and signed an $8,000 mortgage for the remainder. Esteban, his wife Elisa and their four children resided at the property from that date forward. The $8,000 mortgage was paid by Elisa.
 
 
 3
 In 1988, Esteban became suspect in a Drug Enforcement Agency ("DEA") investigation of heroin trafficking. Esteban delivered 17 browns[1] of heroin to DEA Agent Terry Parham on September 9, 1988. After the sale, Agent Lawrence Lepore followed Esteban to the 116 Emerson Street address. On April 5, 1989, DEA agents, accompanied by Providence police officers, executed a federal search warrant at the property. The agents knocked and announced their presence in both English and Spanish. No one responded; however, activity could be heard inside. The agents kicked in the door, entered and discovered Elisa and her daughter Carmen in the living room. The agents searched the house. Seven browns of heroin and $19,325 in cash were discovered in a microwave oven. Elisa was immediately arrested; Esteban surrendered to the police later that same day. After the grand jury returned an indictment against him, Esteban pled guilty on October 26, 1989, to one count of distribution of heroin (the 17 browns delivered to DEA Agent Parham) and one count of possession with intent to distribute heroin (the seven browns found in the microwave). The charges against Elisa were dismissed.
 
 
 4
 On May 25, 1989, the Emerson Street property was seized under 21 U.S.C. § 881(a)(7) by the DEA pursuant to a finding of probable cause that the property had been used to facilitate the possession of, and the possession with intent to distribute, heroin in violation of 21 U.S.C. § 841(a)(1), a crime punishable by more than one year imprisonment. On June 1, 1989, a complaint for forfeiture in rem was filed by the United States against the property. Additionally, a warrant of arrest and notice in rem was issued by a United States magistrate. Notice of the forfeiture action was published in the Providence Journal Bulletin on June 13, 20 and 27, 1989. Default was originally entered against Esteban pursuant to Federal Rule of Civil Procedure 55, but was later vacated as a result of defective service.
 
 
 5
 On December 18, 1989, Esteban filed a claim to the property. On April 5, 1990, Elisa moved to intervene. The district court conducted a hearing on June 11, 1990. An order granting Elisa's motion was issued nine days thereafter. The case proceeded to bench trial on September 12, 1990. Defense counsel had earlier conceded that forfeiture was appropriate against Esteban. The only remaining issue was whether Elisa was entitled to any portion of the property. The district court found that Elisa had obtained an equitable interest in the property by virtue of a resulting trust, that she had no prior knowledge of the property's illegal use, and that she was entitled to a 50% share in the property. The remaining 50% was forfeited to the government.
 
 INTERVENTION
 
 6
 Elisa Colon's motion to intervene asserted possessory and equitable ownership in the property located at 116 Emerson Street. Thus, in effect, the motion acted as a claim to the property. See 7A Moore's Federal Practice p C.16 at 700.13 (1983) ("A 'claimant' ... is a person who assumes the position of a defendant and demands the redelivery to [her]self of the [property seized].") (quoting The Two Marys, 12 Fed. 152 (S.D.N.Y.1882). It was therefore subject to Supplemental Rule for Certain Admiralty and Maritime Claims C(6) (civil forfeiture claims) as well as Federal Rule of Civil Procedure 24(a)(2) (intervention as a matter of right). See Supplemental Rule for Certain Admiralty and Maritime Claims A (with respect to civil forfeiture actions, the "general Rules of Civil Procedure ... are ... applicable ... except to the extent that they are inconsistent with these Supplemental Rules"); United States v. One Dairy Farm, 918 F.2d 310, 311 (1st Cir.1990) ("Proceedings in forfeiture cases are governed by the Federal Rules of Civil Procedure and the Supplemental Rules for Certain Admiralty and Maritime [C]laims"). According to Federal Rule of Civil Procedure 24(a)(2), the following criteria must be met in order to intervene as a matter of right: (1) the party must claim an interest in the property; (2) disposition of the case without intervention, would, "as a practical matter, impair or impede [the party's] ability to protect that interest"; (3) the party's interest is inadequately represented by the existing parties; and (4) the motion for intervention is timely made. See Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir.1989). When the purpose for seeking intervention under Rule 24(a)(2) is to assert a claim to property seized under 21 U.S.C. § 881, Supplemental Rule C(6) provides that a verified claim must be filed within 10 days after process has been executed, or within such additional time as may be granted by the court. See One Dairy Farm, 918 F.2d at 311. The government contends that Elisa Colon's motion to intervene failed in the following three respects: it was untimely, it failed to demonstrate an interest in the property, and it was not accompanied by a verified claim. We disagree.
 
 
 7
 First we consider the issue of timeliness. It is a "time-honored admiralty principle that pleadings and procedural practices should be applied liberally." United States v. One Urban Lot Located at 1 Street A-1, 885 F.2d 994, 1001 (1st Cir.1989). District courts should strive, "to the greatest extent possible" to ensure that "controversies are decided on the merits." Id. Toward that end, the district courts should exercise their "discretion to grant additional time for the filing of a claim ... when 'the goals underlying the time restrictions ... are not thwarted.' " Id. (quoting United States v. 1982 Yukon Delta Houseboat, 774 F.2d 1432, 1436 (9th Cir.1985); see also One Dairy Farm, 918 F.2d at 311 (the decision whether to allow a claim is entrusted to the sound discretion of the district court).
 
 
 8
 The reason for imposing time restrictions is "to force claimants to come forward as soon as possible after forfeiture proceedings have begun." One Urban Lot, 885 F.2d at 1001. Whether a belated claim will be recognized often depends upon the existence of mitigating factors. See One Dairy Farm, 918 F.2d at 311-12 (citing, inter alia, United States v. One (1) 1979 Mercedes 450SE, 651 F.Supp. 351 (S.D.Fla.1987); United States v. One 1979 Oldsmobile Cutlass Supreme, 589 F.Supp. 477 (N.D.Ga.1984); United States v. 1967 Mooney M20-F Aircraft, N9588M, 597 F.Supp. 531 (N.D.Ga.1983)); One Urban Lot, 885 F.2d at 1000 (citing United States v. Beechcraft Queen Airplane Serial Number LD-24, 789 F.2d 627, 630 (8th Cir.1986), for the proposition that "Rule C(6) may be construed liberally in the event of 'mitigating factors' "). Similarly, courts should consider the extent to which the government will be prejudiced if the claim is allowed. See One Urban Lot, 885 F.2d at 1001. (when the government will suffer no prejudice, equity and fairness may require the district court to exercise its discretion in the claimant's favor).
 
 
 9
 With respect to the instant case, we find the following factors persuasive: (1) Elisa Colon was neither named in nor served with a copy of the summons and complaint, and while notice of the pending forfeiture action appeared on three separate occasions in the Providence Journal Bulletin, Elisa does not have a significant command of the English language, see, e.g., Beechcraft Queen Airplane, 789 F.2d at 630 (a more liberal approach may be warranted when the claimant has not received actual notice of the complaint); (2) although forfeiture proceedings were originally instituted in June 1989, as a result of the vacated default judgment against Esteban, preparation for trial did not actually begin in earnest until December 1989; (3) once Elisa sought the aid of counsel and realized the potentially devastating consequences to her interest in the property, she actively pursued her claim; and (4) because discovery was not yet closed,[2] the government had sufficient time to prepare its case against Elisa and thus was not unduly prejudiced by her intervention. Refusal to allow Elisa's motion, on the other hand, would have had devastating consequences--relinquishment of her claim and consequently all interest in the property. On balance, we cannot say that the district court abused its discretion in allowing an extension of time for filing Elisa's claim.
 
 
 10
 Next we consider Elisa's failure to file a verified claim. While Supplemental Rule C(6) mandates the filing of a verified claim setting forth the basis for the claimant's interest in the property, this court has not exacted strict compliance with that technicality. For example, we have consistently held that a verified answer which asserts all the information necessary to a verified claim may substitute for the verified claim. See One Urban Lot, 885 F.2d at 999-1001 (an answer setting forth all the information necessary to a verified claim may be treated as a verified claim provided the purpose behind Supplemental Rule C(6)--to guard against false claims--is not thwarted); accord, One Dairy Farm, 918 F.2d at 313; see also One Urban Lot 885 F.2d at 1000 (the "traditional admiralty view" is that "procedural practices should be construed liberally"). We think that, if the unverified documents, when read together as a whole, evidence a sufficient interest in the seized property, the district court may treat them as satisfying the verified claim requirement.
 
 
 11
 In the instant case, the relevant documents included a motion to intervene, its supporting memorandum and an unverified answer. We believe that these documents, when read together, adequately apprised the government of Elisa's claim and the basis upon which that claim rested. There was no abuse of discretion in allowing the case to proceed despite the absence of a verified claim.
 
 
 12
 Finally we address the issue of whether Elisa's declared interest in the property was sufficient to gain access to the courts. "It is well established that a party seeking to challenge a forfeiture of property must first demonstrate an ownership or possessory interest in the seized property in order to have standing to contest the forfeiture." United States v. Miscellaneous Jewelry, 667 F.Supp. 232, 235-36 (D.Md.1987) (and supporting cases cited therein), aff'd sub nom. One 1985 Nissan, 889 F.2d 1317 (4th Cir.1989) (en banc). At this preliminary juncture, however, the claimant need not prove the full merits of her underlying claim. All that needs to be shown is a "facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and 'prudential considerations defining and limiting the role of the court.' " United States v. $321,470.00, United States Currency, 874 F.2d 298, 302 (5th Cir.1989) (quoting United States v. One 18th Century Columbian Monstrance, 797 F.2d 1370, 1373 (1986), reh'g denied, 802 F.2d 837 (5th Cir.), cert. denied sub nom. Newton v. United States, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1988)).
 
 
 13
 Elisa originally claimed entitlement to the property through a marital equitable interest as established by Rhode Island General Laws 15-5-16.1. Although this was later held to be an improper basis for her claim,[3] at this initial stage it did raise questions about the possibility of an equitable interest in the property acquired through some unwritten marital agreement. See Miscellaneous Jewelry, 667 F.Supp. at 236 ("Congress [has] directed that '[t]he term 'owner' should be broadly interpreted' ") (quoting Joint Explanatory Statement of Title II and III, P.L. 95-633, 95th Cong.2d Sess., reprinted in 1978 U.S.Code Cong. & Admin.News 9496, 9518, 9522). It was not, therefore, an abuse of discretion for the district court to accord Elisa the opportunity to prove her claim at trial.
 
 OWNERSHIP
 
 14
 In a forfeiture action, once the government has demonstrated probable cause for the forfeiture, the burden shifts to the claimant to prove, by a preponderance of the evidence, an ownership interest in the property and ignorance of the illegal conduct which gave rise to the forfeiture. United States v. $250,000.00 in United States Currency, 808 F.2d 895, 900 (1st Cir.1987). We first address the question of ownership. Ignorance will be discussed in the subsequent section.
 
 
 15
 The property located at 116 Emerson Street was registered solely under the name of Esteban Colon. At trial, Elisa attempted to prove an ownership interest in the property by way of a resulting trust, i.e., a verbal agreement between Elisa and her husband entered into at the time of purchase in which he agreed to pay the downpayment of $8,000, she agreed to pay the mortgage of $8,000 and they both agreed that the property would be owned jointly. The government contends that Elisa's mission was not accomplished. We disagree.
 
 
 16
 It was incumbent upon Elisa to prove the existence of the resulting trust by clear and convincing evidence. See Roseman v. Sutter, 735 F.Supp. 461, 465 (D.R.I.1990). Toward that end, Elisa offered her own testimony, the testimony of her daughters Jackie, Carmen and Maricel, and a stack of cancelled money orders. The following scenario was presented. Elisa and her husband verbally agreed at the time the home was purchased that he would pay the downpayment, she would pay the mortgage and they would each take an interest in the home. Thereafter, $103.21 of Elisa's monthly salary[4] was used to purchase money orders and pay the mortgage holder. Esteban and Elisa split the remaining household obligations in the following manner: Esteban paid most of the bills and purchased the groceries, clothing, etc., whereas Elisa was primarily responsible for the maintenance of the home and the care of the children. The cancelled money orders were offered to prove that the mortgage had been paid in full.
 
 
 17
 After hearing the evidence and making several inquiries of its own, the district court was satisfied that a resulting trust existed. In order for this court to overturn that ruling on appeal, we must find clear error. See Fed.R.Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses"); Brennan v. Carvel Corp., 929 F.2d 801, 806 (1st Cir.1991) (in non-jury trials, findings of fact based on oral or documentary evidence should only be set aside for clear error). We do not find clear error. There was ample evidence supporting the district court's decision. Whether we would have reached a different conclusion is irrelevant. See id. ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.") (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985)). The district court's ruling on this issue must therefore stand.
 
 INNOCENCE
 
 18
 Having successfully demonstrated an ownership interest in the property, Elisa then needed to prove, by a preponderance of the evidence, $250,000.00 in U.S. Currency, 808 F.2d at 900, that she had been unaware of her husband's drug activity in their home. Title 21, U.S.C. § 881(a)(7) provides:
 
 
 19
 [N]o property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 20
 This has commonly come to be known as the "innocent owner" defense. See, e.g., United States v. Certain Real Property & Premises, 922 F.2d 129, 130 (2d Cir.1990).
 
 
 21
 The government maintains that Elisa did not adequately prove her ignorance. Its argument runs as follows: Since Elisa was responsible for all of the cooking and cleaning, she must have known that a package of heroin was in the microwave. It is by far more likely that Elisa was the one who hid the drugs during the time the police were attempting to gain entry into the home.
 
 
 22
 While the government's rendering presents one possible interpretation of events, there was also evidence supporting Elisa's version of the facts. First, the government's own witness, DEA Agent Philip Hickey, testified that Elisa Colon was never a suspect in her husband's drug activities. Second, Esteban admitted when he entered his guilty plea that the drugs and money were his. Third, Elisa took the stand on her own behalf and testified that she had no knowledge of her husband's drug activity and that she never would have permitted it in her home if she had known. Fourth, Elisa further testified that she had been out all morning on the day of the search and seizure and that she had only just returned when the police arrived. Fifth, the government had the opportunity to cross-examine Elisa extensively on this issue, and still the district court chose to believe Elisa.
 
 
 23
 We should respect the district court's decision unless clear error was committed below. See Brennan, 929 F.2d at 806 (the clear error standard of review applies to the trial court's determination of witness credibility). The possibility of a separate and contradictory interpretation of the evidence does not mean the one chosen was necessarily erroneous. Id. (if the district court's version is plausible in light of the evidence, the appeals court should not substitute its judgment therefor). There having been sufficient evidence in support of Elisa's defense, the district court ruling should be upheld.
 
 CONCLUSION
 
 24
 Elisa was properly permitted to intervene and raise a claim to the property in question. Having done so, she sufficiently proved both an ownership interest in the property and ignorance of her husband's drug activity. The district court ruling is therefore affirmed.
 
 
 25
 LEVIN H. CAMPBELL, Circuit Judge (Dissenting).
 
 
 26
 While I have sympathy for defendant Elisa Colon, wife of the convicted drug dealer, I believe that the district court and the majority of this panel have not correctly applied Rhode Island law. I, therefore, dissent.
 
 
 27
 In order to prevail as an innocent owner of half the property, Elisa Colon must establish both that she had no knowledge of her husband's drug activities and that she is a beneficial owner of half the property by way of a resulting trust.[1]
 
 
 28
 With some hesitation, I accept this court's holding that the district court did not err in finding that Elisa lacked knowledge of her husband's drug dealing. My hesitancy stems from the existence of strong circumstantial evidence suggesting that she knew of the presence of heroin in the home which she shared with Esteban, her husband. When the officers, armed with a warrant, first arrived at the house and announced their presence in English and Spanish, Elisa did not come to the door or answer. The officers heard movement inside and then broke down the door, finding Elisa and one of her daughters sitting on the living room sofa. The officers found the heroin in a microwave oven in the nearby kitchen; recent use of the oven was indicated by food spatterings on the inside. There was evidence Elisa did all the cooking. Hence it is reasonable to believe she knew of any drugs in the oven, and highly improbable her husband would have placed them in this location if he believed she lacked such knowledge, as she would obviously have soon found them there.
 
 
 29
 As, from the foregoing, a reasonable factfinder could have determined that Elisa knew of the presence of the drugs notwithstanding her denial, I think the district court was plainly in error when it remarked, as it did, that there was "no evidence" of Elisa's knowledge. My colleagues, however, apparently read this assertion in context as reflecting a judicial determination--after considering all the evidence, including Elisa's own testimony--that Elisa was without knowledge of her husband's drug activities (not merely that there was "no evidence" of her knowledge). If so, the question arises whether that imputed finding was clearly erroneous. I have to say not. The district court heard and saw Elisa and various witnesses. The issue boiled down to a question of credibility peculiarly within the court's competence. Therefore, although I am personally not persuaded, I concur in affirming the district court's determination that she lacked knowledge.
 
 
 30
 I cannot join, however, in this court's conclusion that the district court properly found Elisa, on this record, to be half owner of the property by way of a resulting trust. The deed to the real estate was solely in her husband Esteban's name. At trial, Elisa presented evidence that she and Esteban had agreed when they bought the property that Esteban would pay the $8,000 down payment and Elisa would pay the $8,000 mortgage. The district court found that "[t]here is evidence that there was an agreement at the time of the purchase of the property ... between the husband and wife as to how they were to handle the obligations as to the down payment and as to the mortgage.... It seems to me quite probable in the circumstances that the arrangement as described in fact existed." From this the court went on to a non sequitur, namely, that "the Defendant has carried the burden of clear and convincing evidence to the establishment of a resulting trust." The majority now affirms this conclusion, on the grounds that it is a question of fact which can only be overturned on appeal if clearly erroneous. However, the ultimate conclusion that a resulting trust exists is not just one of fact; it is a mixed question of law and fact. Accepting the facts as found by the district court, they are insufficient, by themselves, to impose a resulting trust under Rhode Island law. A resulting trust is not proven in Rhode Island simply by establishing that the party seeking the trust paid for some portion of the property. Rather, the parties, at the time of the purchase, must additionally be shown to have intended that the party seeking the trust would then acquire an ownership interest. The district court here made no such finding as to the parties' intent at the time of purchase,[2] and the little evidence there is of such intent in the record is weak and conflicting. I would, therefore, remand to the district court to reopen the record and make a specific finding on the parties' intent as to ownership.
 
 
 31
 In general, under Rhode Island law,
 
 
 32
 a resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein.
 
 
 33
 Roseman v. Sutter, 735 F.Supp. 461, 464 (D.R.I.1990), citing Restatement (Second) of Trusts § 404 (1959) and Reynolds v. Blaisdell, 23 R.I. 16, 18-19, 49 A. 42 (1901). Thus, where one party contributes a portion of the purchase price, but title is taken in the name of another, it must be shown that "at the time of the conveyance of the property it was the intention and understanding that the contributor was to have beneficial ownership in the whole or in a definite fractional part." Cutroneo v. Cutroneo, 81 R.I. 55, 58, 98 A.2d 921, 923 (1953). Evidence of the contribution by one party may tend to shed light on what the parties meant the ownership to be, but it is merely one "circumstance[ ] which raise[s] an inference" of the parties' intent. Roseman, 735 F.Supp. at 464 (citations omitted).
 
 
 34
 To sustain the court's ruling below, one can argue that while the district court omitted any finding as to an intent to share ownership, it inferentially made such a finding by its end result and by noting that the parties were not aware of "the niceties of recording of titles." One might go on to contend that this implied finding was supported by a reasonable presumption that, as two spouses generally share their home, if one pays for half of the home but title is placed solely in the other's name, the spouses intend that each will own half. See 5 W. Fratcher, Scott on Trusts § 454 (1989) ("In the case of a purchase of a matrimonial home the usual rules as to a resulting trust are much relaxed."). The trouble with this analysis, however, is that there is no authority in Rhode Island for such a presumption. To the contrary, the Supreme Court of Rhode Island has held that, "[t]o prove a resulting trust by reason of the payment by one person of the whole or part of the purchase price of property conveyed to another person, especially if the relation between them is that of husband and wife, the evidence must be full, clear and convincing." Robinson v. Robinson, 66 R.I. 321, 327, 19 A.2d 1, 3-4 (1941) (emphasis added). See also Chase v. Chase, 78 R.I. 278, 283, 81 A.2d 686, 688 (1951) (requiring "full, clear, satisfactory and convincing [evidence,] particularly where the relationship of husband and wife is involved") (emphasis added).
 
 
 35
 My reading of the Rhode Island cases is that some quantum of evidence of an intent to share ownership beyond the mere fact of a contribution by the other spouse is necessary to create a resulting trust. After all, the placing of the deed in one name only, points in the other direction, suggesting an intended gift. If the latter factor is to be overridden, one would expect additional evidence focusing on the parties' intent.
 
 
 36
 In Robinson, a wife sought to establish a resulting trust in her husband's share of property titled in their joint names. In addition to hearing evidence that the wife paid the entire purchase price, the trial court also heard evidence concerning the parties' intent, in the form of testimony as to why the husband had never deeded his share over to the wife. Finding that the evidence as to both was unreliable, the trial court concluded that there was no resulting trust, and the Supreme Court of Rhode Island affirmed. 66 R.I. at 326-27, 19 A.2d at 2-3. In Chase, a wife sought to impose a resulting trust on half of property titled in her husband's name, by showing that she and her husband had established a common fund, which they agreed would be used to purchase property jointly. The court examined both whether the common fund existed and the spouses' agreement as to its use, concluding that the wife had failed to prove "either a capital contribution or a specific agreement." 78 R.I. at 283, 81 A.2d at 689. Finally, in the only Rhode Island case to find a nontitled spouse to be the beneficiary of a resulting trust, the court found a specific agreement to share ownership. The court did not rest its decision on the spouses' purchase of the property with joint funds; it found in addition that the joint funds were deposited " 'upon the distinct understanding that [the wife] would hold them and invest them for the joint benefit of herself and her husband.' " Comella v. Comella, 68 R.I. 275, 279, 27 A.2d 348, 350 (1942) (quoting the trial court). Thus, the wife "took title thereto in her name alone with the distinct understanding that such title was to be 'half and half.' " Id. (quoting trial testimony). These cases strongly suggest that Rhode Island law requires clearer evidence than exists here of an intent to share ownership, evidence going beyond simply a contribution to the purchase price.[3] At very least, these cases indicate the need for an explicit finding on intent by the trial court--a finding not made here.
 
 
 37
 It can be argued that Rhode Island's requirement of a heightened showing of intent in the marriage context is based on archaic notions about marriage. Rhode Island has, in recent times, modified its divorce law so that a spouse can receive a share in the "estate" of the other spouse, based upon a lesser showing. Upon divorce, either spouse may receive a share of the other's estate based on, among other factors, "the contribution of each of the parties in the acquisition ... of their respective estates," without showing that the parties intended joint ownership. 1979 R.I.Pub.Laws Ch. 279 § 2, as amended, codified at R.I.Gen.Laws § 15-5-16.1.
 
 
 38
 But, while the Supreme Court of Rhode Island may conceivably someday wish to alter its law relative to resulting trusts between spouses in a nondivorce context, it has not done so to date, and it is not the province of a federal court to modify state law. This is especially so where the law, whether or not based on an arguably outdated rationale, serves a valuable policy goal. Here, by making it more difficult to establish a resulting trust, the rule makes the title recording system more secure. When a party sees that title to property is in the name of a certain person, he or she can be more confident that that person will be treated as its actual owner. Moreover, the courts of at least one state outside Rhode Island have required, as recently as 1978, proof of intent as well as contribution to the purchase price in order to establish a resulting trust between spouses. Bartula v. Bartula, 6 Mass.App. 907, 908, 378 N.E.2d 466, 468 (1978) (resulting trust found because the "parties intended at the time of the purchase that both own the property and assume the obligation of the mortgage, [and] ... both contributed to the mortgage payments....") (rescript opinion dictum).
 
 
 39
 In this case the district court made no finding on the parties' intent as to ownership, basing its decision entirely on Elisa's payment of the mortgage, and treating this as a sufficient basis to find a resulting trust. My colleagues perpetuate the error. Yet the record evidence of the parties' intent is both weak and in conflict. On the one hand Elisa answered "yes" to the question "did you purchase the house with your husband at 116 Emerson Street?" In addition, there was evidence of an agreement to share household expenses, which might make more likely an intent to share other items, i.e., ownership of the house. On the other hand, the evidence was that Elisa paid the mortgage by giving money orders to her daughters, who in turn filled them out in the sole name "Esteban Colon." Cf. Robinson, 66 R.I. at 326, 19 A.2d at 2-3 (parties' actions over time concerning existing state of title indicate their beliefs whether or not title accurately reflects ownership). In these circumstances, I would remand with directions to reopen the record on the issue of the parties' intent regarding ownership; and for the district court to render a specific finding on whether the parties intended, at the time of the purchase, that Elisa become the beneficial half owner of the property.
 
 
 
 [1]
 "Brown" is a term of art used to describe the method of packaging heroin whereby small quantities of heroin are bound together and wrapped in brown paper
 
 
 [2]
 Although the government had ceased discovery before Elisa's motion to intervene was granted, the court allotted time for discovery had not yet run. Three weeks remained in which the government could have resumed discovery efforts
 
 
 [3]
 Rhode Island General Laws 15-5-16.1 applies only to the assignment of property interests between husband and wife during divorce proceedings
 
 
 [4]
 Elisa held two jobs during the life of the mortgage. The first was with a box company, the second with a caterer
 
 
 [1]
 I agree with the majority that Elisa's defense requires her to prove "an ownership interest in the property" as well as "ignorance of the illegal conduct which gave rise to the forfeiture." (court's opinion at 79). The forfeiture statute does not provide for any equitable defense simply on the grounds that it would be unfair to seize property in which an innocent spouse has invested money. The only lack of knowledge defense to a forfeiture of real property which the statute provides is that "no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission, established by that owner to have been committed or omitted without the knowledge of that owner." 21 U.S.C. § 881(a)(7) (emphasis added). See United States v. Certain Real Property, 922 F.2d 129 (2d Cir.1990) (referring to defense as " 'innocent owner' defense"). Accordingly, Elisa must be shown to be an "owner" of an interest in the property, and such ownership interest, if any, will have been created by state law, here that of Rhode Island
 
 
 [2]
 Counsel for Elisa stated to the court that a resulting trust requires "an agreement that one would take property in the name and that the other would in effect invest money into that property ... and that the person investing the money was to take some share of equity in the property." However, the court found only an agreement concerning the former, not the latter. Although the court did state that, "[w]e're not dealing here with people who have been to law school and are aware of all the niceties of recording of titles and that sort of thing," it is not clear whether this statement was addressed to the resulting trust issue or to a related government argument based on a Rhode Island statute requiring the recording of titles. Even if addressed to the resulting trust issue, this statement cannot be taken as a specific finding of intent
 
 
 N3
 The government argues that Rhode Island law presumes that a contribution to the purchase price of a home by one spouse is a gift to the other spouse. The case cited by the government for this proposition, Luchetti v. Luchetti, 85 R.I. 105, 127 A.2d 244 (1956), differs factually from this case in two ways. First, it involved the payment by a husband of the entire purchase price, while the wife took title to the whole property. Second, it was the husband, not the wife, who made the contribution without getting the title. It may be that the presumption only applies to payments by the husband, based on the outdated view that a husband, as the partner with more assets, would be more likely to make a gift to his wife than vice versa. See 5 Fratcher, Scott on Trusts § 442 (1989). Thus this presumption may not apply to the facts of the present case. Regardless, Rhode Island law calls for "full, clear and convincing evidence" of an intent to share ownership. Here there was neither an express finding nor a developed record on this point