USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1839

 UNITED STATES,
 Plaintiff, Appellee,

 v.

 U.S. CURRENCY, $81,000.00, ETC., ET AL.,
 Defendants, Appellees.

 ____________________

 JOHN P. BULGER,
 Claimant, Appellant.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nancy J. Gertner, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

 Campbell, Senior Circuit Judge,

 and Selya, Circuit Judge.

 _____________________

 George F. Gormley, with whom George F. Gormley, P.C. was on
brief, for appellant.
 Richard L. Hoffman, Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, was on brief, for
appellee United States.

 ____________________

 August 19, 1999
 ____________________ TORRUELLA, Chief Judge. This is an in rem action,
brought by the United States for forfeiture of money owned, at
least in part, by James "Whitey" Bulger. The United States seeks
forfeiture of approximately $200,000 that it claims was derived
from Whitey Bulger's illegal extortion, racketeering, and money
laundering activities. Whitey Bulger, a fugitive since January
1995, has not appeared to file a claim to the property. The only
claimant is his brother, John Bulger. The United States moved to
dismiss John Bulger's claim, arguing that he has no actual
ownership interest in the defendant property. The district court
allowed the motion to dismiss, and subsequently ordered forfeiture
of the property at issue. For the reasons stated below, we VACATE
the judgment entered by the district court.
 BACKGROUND
 In its pleadings and other papers, the government alleges
that Whitey Bulger, together with others, had been actively
involved in criminal activity for a period of some thirty years
preceding the filing of the verified complaint in this action. The
government asserts that, over this extended period of time, Whitey
Bulger "directly or indirectly received and amassed hundreds of
thousands, and probably millions, of dollars . . . from . . .
illegal revenue." 
 Details were given regarding two alleged criminal
episodes, one involving Whitey Bulger's purportedly extortionate
purchase and subsequent sale of a liquor store, the other involving
his purchase, together with others, of a share in a winning
Massachusetts lottery ticket.
 The government contends that between January and May of
1984, Whitey Bulger, together with others and by threats of
violence, purchased at a favorable price a retail liquor store then
known as Stippo's Liquor Mart and the real property on which it was
situated, at 295 Old Colony Avenue in South Boston. Public
documents show that the property was purchased by Kevin Weeks, 
said to be an associate of Whitey Bulger. Two years later, in May
of 1986, the real property was resold to Weeks, Whitey Bulger, and
another person. A few days after that, South Boston Liquor Mart,
Inc., was established to do business at that location.
 At some point between 1988 and 1990, Whitey Bulger
approached his brother John and asked whether he would be a
cosignatory with him on a bank account that he proposed to
establish. John agreed, signed some papers, and the account was
opened as South Boston Savings Bank Account ("SBSB"),
No. 02-44-255305, in the names of James J. Bulger and John P.
Bulger. Thereafter, statements began arriving at John Bulger's
home address. John Bulger did not make deposits to the account,
does not claim any knowledge of the source of or reason for
deposits to the account, and has treated its contents as property
of his brother James. Nonetheless, the checkbook was kept at John
Bulger's house.
 On December 9, 1989, Whitey Bulger, Kevin Weeks, and
the other record owner of the real property at 295 Old Colony
Avenue sold their interests to Whitey Bulger for a total of
$40,000. That same day, an organization known as Shamrock Realty
Trust was established, with Weeks and another person named as
trustees. Shamrock Realty Trust promptly purchased the Old Colony
Avenue property from Whitey Bulger for $400,000, granting a
mortgage to Whitey Bulger, with the property as collateral, to
secure the purchase price. Shamrock Realty Trust was to make
monthly payments to Whitey Bulger in the amount of $4,672.90.
 In December 1990 or January 1991, a "Mass Millions" state
lottery entry was purchased by Michael Linskey and registered in
his name. Under this arrangement, the registrant automatically
participates in drawings over the course of the following year. 
Michael Linskey's entry won in July 1991, and was worth
approximately $14.3 million (prior to taxes), payable in annual
installments over a twenty-year period beginning in July 1991 and
continuing through July 2010. Michael Linskey's brother, Patrick
Linskey, is also alleged to be an associate of Whitey Bulger. 
Within a few days, and before the first disbursement of winnings,
papers were provided to the state lottery commission indicating
that Whitey Bulger, Patrick Linskey, and Kevin Weeks were by prior
agreement entitled to equal parts of a one-half interest in the
winnings (i.e., one-sixth each), the other half belonging to the
previously registered winner, Michael Linskey. At the same time,
arrangements were made with the South Boston Savings Bank to assist
in apportioning and distributing the winnings among the several
individuals mentioned.
 According to information provided by the government, 
shares of the winning entry had been purchased by Whitey Bulger, 
Patrick Linskey, and Kevin Weeks only after the winning drawing. 
For a lump-sum payment of $700,000, Whitey Bulger is said to have
purchased his one-sixth interest in the winnings, amounting to
annual payments of $119,408 (prior to taxes) over a period of
twenty years. In July of each year from 1991 through 1994, the
total winnings, less taxes, were paid to Michael Linskey. Michael
Linskey deposited the winnings in his account at South Boston
Savings Bank, whereupon the bank, pursuant to the above agreement, 
apportioned and distributed the funds, depositing Whitey Bulger's
share into the joint checking account he held along with John
Bulger. Whitey Bulger's lottery share for 1995 and after has been
seized and forfeited in separate proceedings, and is not at issue
here.
 At some point in 1993, John Bulger withdrew about $13,000
from the joint checking account to purchase a car. He says that he
considered this a loan, and that some repayment of this loan had
been made by November 1996, primarily by John Bulger periodically
placing his own cash into an envelope at his home containing funds
intended for Whitey Bulger. John Bulger would also from time to
time pay bills for Whitey Bulger using money including cash from
this envelope. The envelope and notations on it had apparently
been thrown out some time before John Bulger's grand jury testimony
in November 1996.
 On August 24, August 30, and September 10, 1993, John
Bulger made cash withdrawals in the respective amounts of $25,000, 
$75,000, and $90,000 from the joint checking account. He says that
these withdrawals were made at Whitey Bulger's request, and the
money was given to Whitey Bulger without any further explanation
being given to or requested by John Bulger.
 In July 1994, deposits to the joint checking account of
after-tax lottery proceeds amounted to $80,003.36. On
September 16, 1994, Whitey Bulger wrote a check for $100,000
against the joint checking account described above and deposited it
into South Boston Savings Bank Account No. 2-18-17712 in the joint
names of James J. Bulger and John Bulger. Prior to its seizure in
November 1996, it does not appear that there were any further
deposits to the latter account, other than interest in the amount
of $7,851.76 earned on the original deposit, nor were there any
withdrawals from it. It thus appears that the joint checking
account is the sole source of the defendant funds seized from the
latter joint passbook savings account. A bank statement dated
September 18, 1993, indicates that as of that date the balance in
the original joint checking account was $8,572.58. 
 During the thirty-six months from September 1993 through
August 1996, at least twenty-seven deposits of $4,672.90, the
amount due monthly under the Old Colony Avenue real estate sale
agreement, were made to the original joint checking account. The
twenty-seven known deposits would total $126,168.30. If similar
deposits were made in each of the five months for which statements
were unavailable, an additional $23,364.50 would also have been
deposited in amounts suggesting a relationship to the Old Colony
Avenue sale.
 It appears that neither the government nor John Bulger
have been in contact with Whitey Bulger since about December 1994
or January 1995. Whitey Bulger's whereabouts are unknown, and the
government regards him as a fugitive from justice. Criminal
proceedings are now pending in which Whitey Bulger is a named co-
defendant in matters including an alleged RICO conspiracy dating
from 1969 to 1995. See United States v. Salemme, No. 94-10287-MLW
(D. Mass.).
 Both before Whitey Bulger's disappearance and after, John
Bulger used funds from the joint checking account to pay bills for
Whitey Bulger. It does not appear that Whitey Bulger had to make
a specific request for John Bulger to take such actions, and in
fact no such instructions appear to have been received from Whitey
as to bills paid since his disappearance.
 Both before and after Whitey Bulger's disappearance in
January 1995, John Bulger enjoyed a number of vacations, including
a trip to Florida in February and March of 1996 and a cruise to
Bermuda in July 1996. Money from the joint checking account helped
pay for the two 1996 vacations, and might possibly have helped pay
for a vacation John Bulger took to Aruba in late 1994, before
Whitey Bulger's disappearance. John Bulger used money withdrawn
from the joint checking account for these purposes without specific
authorization from Whitey Bulger, solely on the basis that he
believed Whitey Bulger would have permitted him to take and use the
money with an informal understanding that John would repay it at
some later time, if and when he was able to do so. John Bulger did
not keep an exact tally of how much money had been "borrowed" in
this fashion, but estimates that he owes Whitey about $14,000 to
$17,000. John Bulger gave no indication that he believed Whitey
Bulger would be concerned about the absence of more precise records
or formal lending arrangements, and repeatedly stated that he felt
Whitey Bulger would approve of his actions with respect to money
taken from the joint checking account.
 In July 1995, the government initiated forfeiture
proceedings against some of Whitey Bulger's assets, notably his
present and future share of the 1991 winning lottery ticket. After
learning of this, and motivated by a concern that further
forfeiture proceedings might be in the offing, John Bulger made a
series of cash withdrawals from the original joint checking
account, totaling approximately $130,000. They are as follows: 
(1) $80,000 on August 3, 1995; (2) $15,000 on May 10, 1996; and (3)
$35,000 on August 21, 1996. John Bulger kept this money in his
home, or expended it as described below, until it was placed in a
safe deposit box.
 In August 1995, John Bulger loaned $1,000 of the funds
withdrawn from the joint checking account to his and Whitey
Bulger's sister, Jean Holland. John Bulger did not know Holland's
specific plans for that money, and did not make any formal
arrangements for repayment, but decided, without specific
instructions from Whitey Bulger, that he would approve of the loan.
 Around January or February of 1996, John Bulger gave some
$25,000 of the funds withdrawn from the joint checking account in
or since August 1995, to Nancy Stanley, daughter of a longtime
friend of Whitey Bulger's, as a belated wedding gift. John Bulger
did this because he was aware that Whitey Bulger, who was not
present at Nancy Stanley's wedding in late 1995, had in the past
said that he intended to pay for Stanley's wedding. Thus, John
Bulger acted unilaterally, albeit in accordance with what he knew
or surmised about Whitey Bulger's wishes and intentions.
 Shortly before he gave testimony to a grand jury on two
dates in November 1996, John Bulger went to BayBank on Tremont
Street in Boston, where he holds safe deposit box No. 03-116-00040
in his name, and deposited approximately $80,000 to $90,000 of the
money withdrawn from the joint checking account during the past
year and a half there for safekeeping. Thus, the joint checking
account is the ultimate source of the defendant funds seized from
the safe deposit box.
 In his grand jury testimony, John Bulger confirmed so
much of the above banking transactions as was within his personal
knowledge. He indicated that he was not aware of any regular
employment, aside from the liquor store, that his brother, James,
had ever had. He did not indicate that he had any personal
knowledge of any criminal or unlawful activity on James's part.
 In August 1996, the South Boston Savings Bank was
acquired by Bank of Boston. The original joint checking account
became Bank of Boston savings account No. 645-8450, and the South
Boston Savings Bank account became Bank of Boston account No.
1491-77490. At the time of the seizures in November 1996, the
successor to the original joint checking account contained
$9,818.60, the other successor account contained $107,851.76, and
the safety deposit box in John Bulger's name contained $81,000. The
total seized was $198,670.36.
 DISCUSSION
I. Standard of Review
 We review a district court's judgment on the pleadings de
novo, as if we were considering the government's motion anew. See 
International Paper Co. v. Town of Jay, 928 F.2d 480, 482 (1st Cir.
1991). Like the trial court, we accept the claimant's material
allegations as true, and draw all reasonable inferences in favor of
the claimant. See id. The motion at issue here does not call upon
the district court to look to extrinsic matters. See Collier v.
City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998). We cannot
uphold the district court's action "unless it appears beyond doubt
that the [claimant] can prove no set of facts in support of his
claims which would entitle him to relief." Conley v. Gibson, 355
U.S. 41, 45-46 (1957).II. Standing
 Our evaluation of John Bulger's claim to the property at
issue is a two step process. State law determines his ownership
interest in the joint account, see United States v. One Parcel of
Real Property, Appurtenances and Improvements Known as 116 Emerson
Street Located in the City of Providence, Rhode Island ("116
Emerson Street"), 942 F.2d 74, 78-79 (1st Cir. 1991) (reviewing
claim of ownership under Rhode Island law), but then federal law
determines the effect of his ownership interest on his right to
bring a claim. See United States v. National Bank of Commerce, 472
U.S. 713, 722 (1985).
 A. Massachusetts Law
 It is well-established that in a dispute between the
holders of a joint account, or one joint holder and the heirs of
another, the intent of the depositor determines the parties' actual
ownership interests. See, e.g., Ball v. Forbes, 49 N.E.2d 898, 901
(Mass. 1943). Where the joint account is set up for the
convenience of the depositor only, the co-signer on the account
does not have an actual ownership interest that she can assert
against the depositor. See Bradford v. Eastman, 118 N.E. 879, 879-
80 (Mass. 1918).
 As John Bulger correctly contends, however, almost all of
the cases the government cites to this effect share one feature
conspicuously absent here: they are disputes between the joint
owners, or between one owner and the other's heirs, beneficiaries,
or assigns, not between one owner and a third party. As against
the bank, by contrast, the contract of deposit is conclusive
evidence of each party's ownership interest. See Ball, 49 N.E.2d
at 900 ("the contract of deposit is conclusive as between the
parties and the bank"); Bradford, 118 N.E. at 879 ("as between the
banks and these parties, the banks would be justified in treating
the deposits as funds in which the parties had a joint interest").
John Bulger argues that the government's position in this case is
more akin to that of a bank -- an outsider who must rely on the
contract of deposit as proof of each account holder's ownership
interest -- than to that of a co-signer or a co-signer's heirs and
assigns. In his view, only the latter may challenge the "real"
ownership. 
 The government attempts to rebut John Bulger's assertion
by citing cases allowing the attachment or taxation of a joint
account by a creditor. See Heffernan v. Wollaston Credit Union,
567 N.E.2d 933, 939 (Mass. App. Ct. 1991). However, these cases do
not question or deny the non-debtor account holder's actual
ownership interest. They recognize the non-debtor's rights, but
nonetheless allow attachment as a matter of state property law. 
See id. at 938. Further, as the district court noted, the
government's citation to In re Moffitt, Zwerling & Kemler, P.C.,
875 F. Supp. 1152, 1164 (E.D.Va. 1995) (holding that joint bank
accounts remain subject to forfeiture), rev'd in part on other
grounds, 83 F.3d 660 (4th Cir. 1996), cert. denied, 519 U.S. 1101
(1997), is unavailing, because the issue here is not whether the
property is immune from forfeiture, but whether John Bulger's legal
rights in the account enable him to challenge that forfeiture at
all.
 The district court concluded that "the government has
failed to show that Massachusetts law allows an assessment of
'real' ownership interests in a joint account in a dispute between
one of the account holders and a third party who does not raise
derivative claims through the other holder." (Memorandum and Order
at 11.) The district court went on to state that for purposes of
this case, it would assume that John Bulger holds legal title to
the joint account under state law. (See id.)
 Our review of the law leads us to believe that we need
not merely assume John Bulger's legal title, because it is fact. 
In Heffernan, the Massachusetts Appeals Court stated:
 A party to a Massachusetts joint bank
 account . . . has the right to withdraw
 all the funds in a joint account, or any
 portion of them. Unlike a joint tenant of
 property held in a traditional joint
 tenancy, therefore, he may effectively
 exercise control over the entire interest,
 or any part of it, and divest totally or
 partially, the interest of the other.

Heffernan, 567 N.E.2d at 937; see Mass. Gen. Laws ch. 167D, 5
(Joint Accounts) ("[A]ny part or all of the deposits and interest
represented by the joint account may be withdrawn, assigned or
transferred in whole or in part by any of the individual
parties."). None of the arguments put forth by the government
effectively challenges John Bulger's legal title to the joint
account -- which is grounded in statute and case law.

 B. Federal Law
 When a case has been dismissed for lack of standing, the
appellate court's fundamental inquiry is whether "the [appellant]
[has] alleged such a personal stake in the outcome of the
controversy as to assure that concrete adverseness which sharpens
the presentation of issues upon which the court so largely depends
for illumination of difficult constitutional questions." Baker v.
Carr, 369 U.S. 186, 204 (1962). The contours of this inquiry have
been fleshed out by cases which hold that to show standing, a
litigant must allege a "distinct and palpable injury to himself,"
Warth v. Seldin, 422 U.S. 490 (1975), fairly traceable to the
"putatively illegal conduct of the defendant," Gladstone, Realtors
v. Village of Bellwood, 441 U.S. 91, 99 (1979), and likely to be
redressed by the requested relief, Simon v. Eastern Ky. Welfare
Rights Org., 426 U.S. 26, 44-45 (1976).
 The standing inquiry is also informed by "whether the
interest sought to be protected by the complainant is arguably
within the zone of interests to be protected or regulated by the
statute or constitutional guarantee in question." Association of
Data Processing Serv. Orgs., Inc., v. Camp, 397 U.S. 150, 153
(1970). The legislative history of forfeiture law indicates that
a rather expansive "zone of interests" is protected by the innocent
owner provision. See 21 U.S.C. 881(a)(6) (providing a parallel
"innocent owner" defense to that contained in 18 U.S.C. 981(a)(2)
-- the provision at issue here). The Congressional Record
indicates that Congress intended this provision to "be broadly
interpreted to include any person with a recognizable legal or
equitable interest in the property seized." Joint Explanatory
Statement of Titles II and III, 95th Cong., 2d Sess. (1978),
reprinted in 1978 U.S.C.C.A.N. 9518, 9522.
 Accordingly, courts have held that an allegation of
ownership and some evidence of ownership are together sufficient to
establish standing to contest a civil forfeiture. United States v.
$38,570 U.S. Currency, 950 F.2d 1108, 1113 (5th Cir. 1992) ("a
claimant is required to submit some additional evidence of
ownership along with his claim in order to establish standing to
contest the forfeiture"). As we have said: "At this preliminary
juncture . . . the claimant need not prove the full merits of her
underlying claim. All that needs to be shown is a facially
colorable interest in the proceedings sufficient to satisfy the
case-or-controversy requirement and prudential considerations
defining and limiting the role of the court." 116 Emerson Street,
942 F.2d at 78 (citations and internal quotation marks omitted).
 Courts generally do not deny standing to a claimant who
is either the colorable owner of the res or who has any colorable
possessory interest in it. See United States v. $321,470.00 in
United States Currency, 874 F.2d 298, 303-04 (5th Cir. 1989)
(ownership or possessory interest sufficient); United States v.
$122,043.00 in United States Currency, 792 F.2d 1470, 1473 (9th
Cir. 1986) (possession sufficient).
 We see little analytic difference between Warth's
approach and the owner-possessor approach in forfeiture cases. See
United States v. Content of Account Nos. 3034504504 & 144-07143 at
Merrill, Lynch, Pierce, Fenner & Smith, Inc., 971 F.2d 974, 985 (3d
Cir. 1992). An owner or possessor of property that has been seized
necessarily suffers an injury that can be redressed, at least in
part, by return of the seized property. See id.
 While John Bulger has legal title to the defendant
property, the question still remains whether he is a nominal or
straw owner of the property or a legal owner who exercised dominion
and control. "[C]ourts have uniformly rejected standing claims put
forward by nominal or straw owners. Thus, even possession of legal
title to the res may be insufficient to establish standing to
contest the forfeiture." Id. (citation omitted). 
 In United States v. One 1981 Datsun 280 ZX, 563 F. Supp.
470 (E.D.Pa. 1983), the court disregarded a car's legal title and
denied a father standing because it was his son who stood "to
suffer from the Datsun's forfeiture." Id. at 475. The court
relied on evidence that the car was referred to as the son's, that
the son frequently drove the car but the father did not, that the
car was "turbocharged and capable of great speed" but the father
was seventy-two years old and suffered from a heart condition, and
that the father did not pay for the car. See id. Thus, though the
car was kept at the father's house and the father held legal title
to it, the district court held the father did not have standing to
contest the forfeiture because the son was the only person who
exercised dominion and control over the car. See id. at 476.
 In One 1981 Datsun 280 ZX, the court relied on United
States v. One 1945 Douglas C-54 (DC-4) Aircraft, 604 F.2d 27 (8th
Cir. 1979) ("1945 Douglas I"), appeal after remand, United States
v. One 1945 Douglas C-54 (DC-4) Aircraft, 647 F.2d 864 (8th Cir.
1981) ("1945 Douglas II"), cert. denied, 454 U.S. 1143 (1982). 
There, the district court initially ordered forfeiture of an
aircraft to the government. See 1945 Douglas I, 604 F.2d at 27. 
An intervenor who held legal title to the aircraft appealed. The
government contested this intervenor's standing in the district
court but that court did not decide the standing issue. The Eighth
Circuit then refused to reach the merits, holding that the standing
question should be examined by the district court in the first
instance. See id. at 29. Although the intervenor had tendered the
money to purchase the aircraft, the court noted that an individual
named Albert Kammerer ("Kammerer") had actually provided the funds. 
The record in the district court also contained evidence tending to
show that, on Kammerer's demand, the intervenor gave him a blank
bill of sale for the aircraft. See id. It also showed that
Kammerer considered himself the owner of the aircraft. See 1945
Douglas II, 647 F.2d at 866.
 On remand, the district court held that Kammerer was the
true "owner" of the res. See id. The court of appeals then
affirmed on the merits because "[t]he evidence is consistent with
Kammerer's dominion and control," id. at 867, and therefore the
district court's conclusion was not clearly erroneous. See id. at
866; see also United States v. 526 Liscum Dr., 866 F.2d 213, 217
(6th Cir. 1988) ("[P]ossession of bare legal title by one who does
not exercise dominion or control over property may be insufficient
to establish standing to challenge a forfeiture.") (citing United
States v. 900 Rio Vista Blvd., 803 F.2d 625, 630 (11th Cir. 1986)
(emphasizing dominion and control in determining standing in a
forfeiture case)).
 Here, the res in question was derived from a joint
account in John Bulger's and Whitey Bulger's names, at the South
Boston Savings Bank Account No. 02-44-255305. It was also the
source of all the funds contained in the other Bank of Boston
account, Account No. 1491-77490, which at the time of seizure
contained only the amount of the initial deposit of $100,000 made
by Whitey Bulger in the form of a check drawn on the original SBSB
account, and the bank interest on that deposit. The money in the
safe deposit box, according to John Bulger's testimony, was money
he had withdrawn from the original SBSB account to prevent the
government from seizing it.
 John Bulger testified before the grand jury that Whitey
Bulger opened the original SBSB account on his own initiative with
funds in Whitey Bulger's exclusive possession:
 A. My brother just came to me and asked
 me to sign some cards, and he was
 opening an account, I guess, and I put
 my name, my social security number and
 my address on there, on the little
 white cards.
 Q. Your brother, James Bulger, came to
 you and asked you to --
 A. Yes.
 Q. -- put your name on an --
 A. Yeah.
 Q. -- account?
 A. Yeah. He was -- opening an account and
 he just asked me if I would go on it.

 Whitey Bulger did not tell John why he was opening the
account and John did not ask. In his verified claim filed in this
case, John stated: "My brother, James, informed me of his wish to
create a joint account at [SBSB] with myself, obtained my
permission to do so and established the account using, inter alia,
forms executed by me and him."
 John believes that Whitey Bulger opened the account with
his own money, and that all of the subsequent deposits were made by
Whitey Bulger or others acting on his behalf. He denies knowledge
of the source of any of the deposits made into the account, and
does not know how deposits were made after Whitey Bulger became a
fugitive, or by whom. John has never deposited any money in the
account. He has referred to the account checkbook as "his
[James's] checkbook," and to the money as "my brother, Jim's
money." For example, he explained that he withdrew money from the
account in August 1995 after he learned that the government had
confiscated James's lottery proceeds:
 I took it out of the South Boston Savings bank
 because of -- I felt -- I took it upon myself
 -- it -- it belongs to my brother, and I took
 it out, and I felt that the government, after
 they confiscated his lottery, I felt that they
 were going to confiscate his money, and I was
 just looking out.

 The district court concluded that John's testimony as to
his use of the account was consistent with a belief that the money
was not his but instead belonged to his brother Whitey Bulger. 
Based on John Bulger's testimony, it held that John Bulger lacked
dominion and control over the res and that his disclaimer of
ownership of the property went far beyond the evidence of straw
ownership put forward by the government in other forfeiture cases. 
In reaching its decision, the district court cited: (1) John's
sworn testimony that he does not consider the money his; (2) his
lack of deposit slips for the account; (3) his failure to
faithfully read any of the bank statements until after Whitey
Bulger became a fugitive; and (4) his acknowledgment that almost
all of the withdrawals he made were either for Whitey Bulger's
convenience or to carry out Whitey Bulger's directions and wishes. 
The district court found that the only factor weighing in John's
favor was that he made withdrawals to finance his own vacations and
to purchase a car. Nevertheless, the district court discounted
this as indicium of ownership because John Bulger described these
transactions as loans from Whitey Bulger that he feels obligated to
repay.
 After carefully reviewing the grand jury testimony, we
disagree with the district court's conclusion and hold that John
Bulger did indeed exercise sufficient dominion and control over the
res to have standing in this civil forfeiture proceeding. From
John Bulger's grand jury testimony it is apparent: (1) that the
bank statements for the joint account were mailed to John Bulger's
address; (2) that John Bulger personally stored the statements in
an envelope in his kitchen; (3) that John Bulger made withdrawals
of significant amounts and stored the money in his home; (4) that
John Bulger, at almost all times, had physical possession of the
checkbook in his home; and (5) that of the two parties, John Bulger
was the party who wrote checks drawn on the account.
 After Whitey Bulger became a fugitive, John Bulger made
several transactions involving funds in the joint account without
Whitey Bulger's explicit direction. 
 First, he gave a wedding present of $25,000 to Nancy
Stanley. John Bulger stated: "I just thought that my brother would
-- where he wasn't around, would just -- he told me a long time
ago, he was going to have a wedding for Nancy Stanley, and he
didn't. And I just took it upon myself . . . . I just -- I -- I
gave it to her." (emphasis added). 
 Second, John Bulger used money from the joint account to
travel on trips to Florida and Bermuda. The government inquired
about the source of the funds for the trips during John Bulger's
grand jury testimony:
 Q. You said you borrowed the money from
 the account?
 A. Well, I -- I took the money from the
 account and ---
 Q. You took the money from the account?
 A. I took the money. My brother would
 let me take that money.

 Third, John Bulger unilaterally loaned his sister, Jean
Holland, one thousand dollars from the joint account.
 Finally, John Bulger withdrew a significant amount of
money, approximately $13,000, to buy a car. Excluding the gift to
Nancy Stanley, John Bulger estimated that he spent "probably 12 or
13 thousand" dollars of the money in the joint account.
 In rejecting John Bulger's claim that he exercised
dominion and control over the account, the district court concluded
that John Bulger had "negated any inference of ownership that these
withdrawals might have raised by repeatedly describing these
transactions as loans from [Whitey Bulger] that he feels obligated
to pay back." (Memorandum and Order at 15.) We wish that the
Bulgers' financial situation were so clear, for clarity is an
element that the brothers Bulger joint account sorely lacks. The
confusion as to whether the money taken from the joint account was
a loan, and if it was a loan, how the money was to be repaid is
illustrated by the excerpt below from John Bulger's testimony:
 Q. But just so that the record is clear
 on these vacation trips here, is it
 your testimony that you have actually
 paid that money back to the account
 since those trips, back to the joint
 account?
 A. I think so, yes. I, I owe him some
 money, but I just took some money, and
 I was going to pay him back, you know,
 when I see him and that's, I've taken
 some money from time to time.
 Q. Okay. Do you understand my question? 
 I'm not asking you right now about
 money you've taken out of the account. 
 What I'm asking is, you testified that
 the money you used to pay for these
 trips that you've described, including
 the trip to Bermuda, was money that
 you took out of the joint account,
 which you testified earlier was your
 brother's money, and you've
 characterized that withdrawal as a
 loan.
 My, my question to you is, have you ever 
 repaid --
 A. Yes --
 Q. -- loan?
 A. Yes.
 Q. All right. And --
 A. Yes, yes --
 Q. -- how have you repaid the loan?
 A. In, in cash.
 Q. In cash. So, you've made cash deposits
 to that account?
 A. No.
 Q. All right. How have you repaid the
 loan then?
 A. I had some money in my house that I
 paid his bills with, and I just put it
 with that.
 Q. So you're saying you repaid this loan
 by using your own money to pay his
 bills?
 A. No. I owed him some money --
 Q. Right --
 A. -- and I just put it in an envelope,
 and it belongs to him.
 Q. Are you still holding that money in an
 envelope in your house, sir?
 A. It's just about gone because I've been
 paying his bills.

(Emphasis added). Given that Whitey Bulger has not been seen for
over four years, it is doubtful that John Bulger will be repaying
his brother any time soon. Moreover, if he does see him, he will
not have an accurate record of the amount he "owes." The
government inquired:
 Q. And since he left, have you kept any
 record of the money that you've
 borrowed from him?
 A. No.
 Q. And have you kept any record of the
 payments that you've, as you've
 described it, the cash you've taken
 out of your paycheck and put aside for
 him?
 A. I've made some notations somewhere in
 the house where I paid his bills and
 how much I owe him a little bit, yes.
 Q. Where are those?
 A. I got, I got no idea.

 John Bulger has estimated that he "owes" Whitey Bulger 
from $7,000 to $17,000. As to how he came to such an estimate, the
government asked the following questions and received the following
answers:
 Q. How would you create the estimate, sir?
 A. I'd just tell my brother what I think
 I owe him and he'd, he'd accept that.
 Q. So, you'd make it up?
 A. I wouldn't make it up like I'm lying
 to him.
 Q. What would you base your estimate on, sir?
 A. Figures.
 Q. Well, that's right. I'm trying to --
 A. Yeah. I, I --
 Q. If you base --
 A. I may owe him $17,000.

 The general state of confusion encompassing the funds in
the joint account was best expressed in one of the questions posed
to John Bulger by a grand juror:
 Q. Sir, an hour ago, you told us that you
 owed your brother $7,000 to $8,000. 
 Now, an hour later, it's up to
 $17,000. You have us confused. You
 have me confused.
 A. Now, I owed some money from the car
 back in 1993, and I, I paid off quite
 a bit of it, and I had borrowed some
 money, and I've, since he's left, I've
 been paying his bills with some of his
 money and some of my own money, and I
 would say that I, I borrowed or I, I
 took some money over the last couple
 of years that I will pay him back.

 While John Bulger's testimony is meandering and often
inconsistent, at the end of the day, we believe that the quality
and quantity of John Bulger's transactions involving the joint
account are sufficient for us to conclude that he exercised
sufficient dominion and control over the account to have standing
to contest the civil forfeiture in this case. His contacts with
the joint account clearly exceed those of the "straw owners" in the
cases cited by the district court.
 We disagree with the district court's conclusion that
"[w]hatever the rights of a joint owner to a bank account, however
characterized, John did not believe that he had a right to exercise
them." (Memorandum and Order at 14 n.3.) The fact of the matter
is that John Bulger did act as the joint owner of a bank account
would. As we noted above: (1) he received the statements at his
residence; (2) he had physical possession of the checkbook; (3) he
wrote checks drawn on the account; and (4) he made withdrawals from
the account. All of these actions occurred both before and after
Whitey Bulger's flight. There is also no denying that he is the
only one who made any withdrawals after Whitey Bulger's flight. He
withdrew money to be used for: (1) a wedding present for Nancy
Stanley; (2) a loan to his sister; and (3) funds for various
vacations.
 The cases cited by the district court rejecting standing
for the legal title holder of the res almost all invariably have
one theme in common: a lack of involvement by the legal title
holder with the res. In United States v. Vacant Land Located at
10th Street & Challenger Way in Palmdale, California, 15 F.3d 128
(9th Cir. 1993), the claimant had made no payments on the mortgage
or taxes due on the property and did not even have a key necessary
to enter it. See id. at 130. In 526 Liscum Drive, the claimant
held title to the property in Ohio where her father lived, but she
herself lived in California and had only visited the property once. 
See 526 Liscum Drive, 866 F.2d at 215. In One 1981 Datsun 280 ZX,
although the claimant held legal title to the car and the
automobile was kept at the father's house, it was doubtful that the
seventy-two year old claimant with a heart condition would have
driven the car. See One 1981 Datsun 280 ZX, 563 F. Supp. at 475. 
Finally, in United States v. Certain Real Property Located at River
Road, Eliot, York County, Maine, 839 F. Supp. 1 (D. Me. 1993),
aff'd without published opinion, 23 F.3d 395 (1st Cir. 1994),
although the claimant had legal title to the property, his father,
who had transferred the property to him, continued to live on the
property and pay all the necessary taxes and upkeep, and the
claimant had no knowledge about the property. See id. at 3. John
Bulger's involvement with the joint account was far greater than
that of the claimants cited above. He acted as a joint owner
would, writing checks and withdrawing money, and exercised dominion
and control over the account.
 Finally, we end by noting that by finding that John
Bulger has standing in this case, we do no more than give John
Bulger the right to contest that the property is properly subject
to forfeiture. If and only if John Bulger is correct in his
assertions that the property is not subject to forfeiture, will he
prevail. CONCLUSION
 For the reasons stated above, we VACATE the order of the
district court, and REMAND the matter to the district court for
further proceedings consistent with this opinion.