Garsh, E. Susan, J.
In this contract action, the plaintiffs allege that their former employers, Excel Switching Corporation and Lucent Technologies, Inc., breached certain stock option agreements. This matter is before the court on the defendants’ motion for summary judgment pursuant to Mass.R.Civ.P. 56 and the plaintiffs’ motion for partial summary judgment. For the reasons discussed below, the defendants’ motion is ALLOWED, and the plaintiffs’ cross motion for partial summary judgment is DENIED.
BACKGROUND
The undisputed facts or disputed facts construed in the light most favorable to the plaintiffs, as revealed by the summary judgment record, are as follows.
*234 Plaintiffs Robert Colletti (“Colletti”), Stephen Elbeeiy (“Elbeeiy”), David Fortin (“Fortin”), Stefan Gieseler (“Gieseler”), Edward Los (“Los”), Kimberly Manion (“Manion”), Naresh C. Parmar (“Parmar”), Peter Rood (“Rood”), Kenneth Stess (“Stess”), and Michael Wood (“Wood”) are former employees of RAScom, Inc. (“RAS-com”) or one of its subsidiaries.[3] Plaintiff Mark Galvin (“Galvin”) was the President and CEO of RAScom. On October 14, 1998, defendant Excel Switching Corporation (“Excel”) sent a Letter of Intent to RAScom concerning the proposed acquisition of RAScom by Excel. This letter was signed by Excel’s Chief Executive Officer, Bob Madonna (“Madonna”). In a section entitled “Nonbinding provisions,” paragraph 8 of the Letter of Intent stated:
Benefits. After the closing, all employees of the Company shall be entitled to participate in Buyer’s existing employee benefit programs and shall be credited with all years of service with the Company for purposes of determining their benefits under such programs. Any outstanding and unvested options held by employees of the Company shall be assumed by Buyer. Buyer shall have the right to consolidate current Company employee benefit programs with current Buyer programs.
Excel acquired RAScom and its subsidiaries on May 10, 1999 in a merger transaction. The merger was treated and accounted for as a “pooling of interests” under accounting and Securities and Exchange Commission rules then in existence. In accordance with these pooling rules, the operating results of RAScom and Excel were combined for all periods prior to the consummation date, and previously issued financial statements were restated as though the companies had always been combined since inception. In the combined and restated financial statements prepared after the merger, Excel and RAScom were collectively referred to and defined as “the Company.”
All employees of companies that were acquired by Excel were granted Excel Stock Options under Excel’s 1997 Stock Option Plan. After the May 10, 1999 merger, Excel representatives held two meetings with RAScom employees at RAScom’s office in Salem, New Hampshire on June 1 and June 3, 1999. At one of these meetings, Excel’s Vice-President and General Counsel, Christopher Stavros (“Stavros”), stated that Excel would use each employee’s date of hire with RAScom as the date of hire for purposes of all Excel benefits. According to several plaintiffs who attended the meetings, when Stavros was asked specifically about the Stock Option Plan, he stated that the RAS-com date of hire would be honored for all employee benefits, including stock options.[4] A double-sided information sheet entitled “Employee Benefit Program for Regular Full-Time Employees” was handed out at the meeting. It listed “Excel Stock Option” as a benefit. This handout contained the disclaimer, “THIS SUMMARY, LIKE OTHER SUMMARIES, IS INTENDED AS A GENERAL DESCRIPTION AND DOES NOT SUPERSEDE ANY LANGUAGE IN THE PLAN DOCUMENT OR SUMMARY PLAN DESCRIPTION, WHICH YOU ARE ADVISED TO CONSULT.”
At least one of the June meetings was attended by Edward Gerlach (“Gerlach”), Excel’s Manager of Financial Reporting and the administrator of the Excel Stock Option program. Before Manion signed her option agreement, she spoke to Gerlach about the issue of employment dates for purposes of stock vesting, and Gerlach stated that whatever had been represented in the meeting about hire dates would be honored. Gieseler also spoke to Galvin before Galvin signed his option agreement, and Gieseler assured him that the start date used would be his start date with RAScom.
Each of the plaintiffs signed a Non-Qualified Stock Option Agreement (“Option Agreement”), granting them stock options. The Option Agreement of each plaintiff other than Gieseler states that “Excel Switching Corporation, a Massachusetts corporation (the ‘Company’), hereby grants as of May 10, 1999 to [plaintiff] (the ‘Optionee’) an option to purchase” a specified maximum of shares. Gieseler’s Option Agreement contains the same language except the grant is “as of June 3, 1999.” The Option Agreement further provides in relevant part:
Grant Under the 1997 Stock Option Plan. This option is granted pursuant to and is governed by the Company’s 1997 Stock Option Plan (the “Plan”) and, unless the context otherwise requires, terms used herein shall have the same meaning as in the Plan. Determinations made in connection with this option pursuant to the Plan shall be governed by the Plan as it exists on this date.
Paragraph 3 of the Option Agreement contains a vesting schedule providing for stepwise vesting measured from the date of the option grant. Paragraph 16(a) of the Option Agreement states:
This Agreement constitutes the entire agreement between the parties relative to the subject matter hereof, and supersedes all proposals, written or oral, and all other communications between the parties relating to the subject matter of this Agreement. This Agreement may be modified, amended or rescinded only by a written agreement executed by both parties.
In addition, the Option Agreement provides for accelerated vesting of stock options in the event of an acquisition of Excel. Paragraph 17 of the Option Agreement states:
Subject to and in accordance with Section 22 of the Plan, upon the merger, consolidation, sale of all or substantially all of the Company’s stock or assets or other business combination involving the Company as otherwise set forth in Section 22 of the Plan (an “Acquisition"), this option shall, immediately prior to the consummation of such Acquisition, *235 become vested and exercisable by the Optionee as set forth in Section 22 of the Plan.
Above the signature line on each of the Option Agreements, it states, “IN WITNESS WHEREOF, the Company and the Optionee have caused this instrument to be executed as of the date first above written.” The plaintiffs actually received and executed the Option Agreements on or after June 10, 1999, several days to a month after “the date first above written” on the Option Agreements.
Section 1 of the 1997 Stock Option Plan states that its purpose is “to provide incentives ... to the officers and other employees of the Excel Switching Corporation (the “Company"). . .” Section 22 of the 1997 Stock Option Plan provides:
Acceleration and Vesting of Option for Business Combinations. Upon any merger, consolidation, sale of all (or substantially all) of the assets of the Company, . . . then the remaining unvested portions of any Option outstanding to any Optionee shall, immediately prior to the consummation of any of the foregoing events, become vested and immediately exercisable by the Optionee according to the following formula and dependent upon the length of the Optionee’s continuous months of employment or engagement by the Company prior to the consummation of the Acquisition, provided, however, that this Section shall not apply to any reincorporation of the Company in a different State pursuant to a migratory merger:
For an Optionee:
(i) If the Optionee has been employed by the Company for 36 months or more, then the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(ii) If the Optionee has been employed by the Company for more than 30 but less than 36 months, then 80% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(iii) If the Optionee has been employed by the Company for more than 24 but less than 30 months, then 50% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(iv) If the Optionee has been employed by the Company for more than 18 but less than 24 months, then 40% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(v) If the Optionee has been employed by the Company for more than 12 but less than 18 months, then 30% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(vi) If the Optionee has been employed by the Company for more than 6 but less than 12 months, then 20% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
(vii) If the Optionee has been employed by the Company for more than 1 but less than 6 months, then 10% of the remaining unvested portion of any Option held by such Optionee shall become fully vested and exercisable.
Coletti’s Option Agreement granted him an option to purchase a maximum of 1,000 shares; Elbeeiy’s Option Agreement granted him an option to purchase a maximum of 5,000 shares;[5] Fortin’s Option Agreement granted him an option to purchase a maximum of 2,500 shares; Gieseler’s Option Agreement granted him an option to purchase a maximum of 15,000 shares; Los’s Option Agreement granted him an option to purchase a maximum of 20,000 shares; Parmar’s Option Agreement granted him an option to purchase a maximum of 20,000 shares; Manion’s Option Agreement granted her an option to purchase a maximum of 1,000 shares; Stess’s Option Agreement granted him an option to purchase a maximum of 20,000 shares; and Wood’s Option Agreement granted him an option to purchase a maximum of 2,500 shares.
Galvin’s agreement granted him an option to purchase a maximum of 200,000 shares. Shortly before the closing of the RAScom/Excel merger, Madonna promised Galvin 300,000 shares of Excel stock. However, in May or June of 1999, at Excel’s Hyannis headquarters, Madonna informed Galvin that, because of complications relating to the pooling of interest accounting, the company could only issue 200,000 shares initially and would issue the remaining 100,000 shares at a later date.
Following the merger, Excel used the plaintiffs’ RAScom date of hire for purposes of some Excel employee benefits, including vacation time, health insurance, dental insurance, life insurance, and the 401(k) plan. In August of 1999, Excel announced an anticipated merger with defendant Lucent Technologies, Inc. (“Lucent”). On August 18, 1999, Parmar e-mailed Gerlach inquiring whether the length of service for purposes of stock vesting would be calculated from the date of employment with RAScom or from May 10, 1999. Gerlach responded by e-mail that May 10 would be the date utilized. Parmar forwarded Gerlach’s response to Galvin, noting that it contradicted the “pooling of interest” term for the RAScom acquisition. On August 18, Gerlach distributed an e-mail to Excel employees, including the plaintiffs, entitled “Questions Regarding Stock and Options” which stated in part:
Q. How does acceleration work for the 1997 Stock Option Plan?
*236 R. Acceleration depends upon the number of months of service at Excel at the time of the closing
On August 20, 1999, Manion e-mailed Stavros inquiring about the effective date of service for RAScom employees for purposes of the stock acceleration. By e-mail dated August 23, Gerlach responded that the acceleration date for RAScom employees was May 10. In August of 1999, Galvin commented to Madonna that he understood why the pooling of interests rules required the company to delay granting additional shares. Madonna did not respond to this statement. Galvin did not demand his remaining 100,000 shares from Madonna or Excel at that time or at any time until this litigation.
On September 14, 1999, Gerlach sent an e-mail to all employees concerning the option vesting issue, which stated in relevant part, “For employees hired in conjunction with an acquisition (XNT, Quantum, RAS-com, Phoenix, ICC): the acquisition date is the first date of employment for purposes of the acceleration clause. These are the facts. Unfortunately, no changes to the original terms of your option grant can be made.”
On November 1, 1999, Gerlach asked Galvin to execute an Affiliate Lockup Letter that states:
The undersigned hereby further represents to and covenants with Lucent that . . . the undersigned will not sell, transfer or otherwise dispose of any of Parent Securities received by the undersigned in connection with the Merger until after such time as results covering at least 30 days of post-Merger combined operations of Excel and Lucent have been published by Lucent,- in the form of a quarterly earnings report, an effective registration statement filed with the SEC, a report to the SEC on Form 10-K, 10-Q or 8-K, or any other public filing or announcement which includes such combined results of operations, except as would not otherwise reasonably be excepted to adversely affect the qualification of the Merger as a pooling-of-interests.
Galvin refused to sign the letter. Madonna insisted that Galvin sign the letter, but Galvin again refused, after consulting with his own attorney. Galvin spoke to Jean Rankin (“Rankin”), General Counsel for Lu-cent, who told him that if he did not sign the lockup agreement, she would have to postpone the closing of the Lucent/Excel merger. Rankin told Galvin that if he signed the agreement, she would meet with him personally and make an independent assessment of the issues he had with the option agreement. Galvin signed the Affiliate Lockup Letter and delivered it to Stavros, Excel’s in-house legal counsel. Thereafter, Rankin never met with Galvin and did not return his phone calls.
On November 3, 1999, Lucent acquired Excel in a pooling of interests merger. Lucent’s purchase of Excel was an “acquisition” within the meaning of Paragraph 17 of the Option Agreement and Section 22 of the 1997 Stock Option Plan. Following the merger, there was a meeting in Salem, New Hampshire with several representatives from Lucent, including Bill Kaiser and Amy Sacco, at which Lucent stated that it would honor Excel’s promise to use the RAScom starting date for purposes of all employee benefits.
Excel accelerated vesting of only 10% of the unvested portion of each plaintiffs stock options based on an employment date of May 10, 1999, the date of the RAScom/Excel merger. Gerlach sent an e-mail to all Excel and RAScom employees instituting a blackout period during which employees could not exercise their options. This blackout period was lifted on December 3, 1999.
By letter dated January 11, 2000, Lucent’s Corporate Counsel, Paul DiMaio, advised Galvin:
There is no provision in the Excel Stock Plan or the Excel Stock Agreement for including service with a prior company for purposes of vesting, or for any other purpose for that matter. Nor does RAScom fall within the meaning of the term “Company” as set forth in the Excel Stock Plan. Thus, because there are no provisions crediting prior service, the acceleration schedule in the Excel Stock Plan determines the amounts and time periods for vesting based on Excel service, not service from another company.
On February 18, 2000, Stavros sent Galvin a letter terminating his employment with Lucent.
Wood never exercised the options that he was granted under his Stock Option Agreement with Excel. Parmar never exercised the options that he was granted under his Option Agreement with Excel.
On July 7,2004, the plaintiffs filed this lawsuit. The plaintiffs’ Second Amended Complaint alleges breach of contract and breach of the implied covenant of good faith and fair dealing, and seeks to recover on a theory of promissory estoppel.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 *237 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
I. Breach of Contract
To establish breach of contract, the plaintiffs must demonstrate that there was a valid contract, that the defendants failed to perform the terms of the agreement without legal excuse, and that the defendants’ breach caused the plaintiffs damage. Loranger Constr. Corp. v. E.F. Hauserman Co., 1 Mass.App.Ct. 801, 801 (1973); Guckenberger v. Boston Univ., 957 F.Sup. 306, 316 (D.Mass. 1997).
Use of RAScom Hire Date
The plaintiffs allege that Excel and Lucent breached a contractual obligation to use the plaintiffs’ RAScom hire date as their employment date for purposes of the vesting of stock options granted under the Option Agreement. The defendants contend that they are entitled to judgment as a matter of law because the obligation asserted by the plaintiffs contradicts the clear terms of Paragraph 17 of the Option Agreement and Section 22 of the Plan, which base vesting upon employment by the “Company,” defined in the Plan as Excel.
It is elementary that an unambiguous contract must be enforced according to its terms. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).[6] Here, the plaintiffs do not appear to argue that the Option Agreement is ambiguous with respect to the operative date of employment for vesting purposes, nor would such an argument prevail. Whether a contract is ambiguous is a question of law for the court. Freelander v. G.&K. Realty Corp., 357 Mass. 512, 516 (1970); Berkowitz v. President & Fellows of Harvard College, 58 Mass.App.Ct. 262, 270, rev. den., 440 Mass. 1101 (2003). A contract is ambiguous where the language at issue is susceptible of more than one meaning and reasonably intelligent persons would differ as to which of two or more meanings is the proper one. Lumbermens Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995); Jefferson Ins. Co. of New York v. Holyoke, 23 Mass.App.Ct. 472, 475, rev. den., 399 Mass. 1104 (1987). An ambiguity is not created simply because a controversy exists between the parties over the proper interpretation. Id. The Option Agreement and incorporated terms of the Plan are clear that vesting depends on the length of employment with Excel and does not include any prior period of employment with an acquired company.[7]
The parol evidence rule is a substantive principle of contract law that bars the introduction of antecedent or contemporaneous written or oral agreements to contradict, vary, or broaden the terms of an integrated, unambiguous writing. See Williams v. Pittsfield Lime & Stone Co., 258 Mass. 65, 68-69 (1927); Sound Techniques, Inc. v. Hoffman, 50 Mass.App.Ct. 425, 429 (2000), rev. den., 433 Mass. 1102 (2001). Before the parol evidence rule comes into operation, the court must be sure that it has before it a fully integrated written contract intended by the parties as the exclusive and complete statement of their agreement. Kelley v. Arnold, 326 Mass. 611, 615 (1950); Sound Techniques, Inc. 50 Mass.App.Ct. at 429. The preliminary question of integration is one of fact reserved for the court. Starr v. Fordham, 420 Mass. 178, 188 n.8 (1995).
Where a writing shows on its face that it is the entire agreement of the parties and comprises all that is necessary to constitute a contract, it is presumed that the parties have placed the terms of their bargain in this form intending it to be a complete and final statement of the whole transaction. Gifford v. Gifford, 354 Mass. 247, 249 (1968); Bendetson v. Coolidge, 7 Mass.App.Ct. 798, 802-03 (1979); Leisure Sports Inv. Corp. v. Riverside Enter., Inc., 7 Mass.App.Ct. 489, 492 (1979). In view of its specificity and completeness, and taking into account the Option Agreement’s explicit integration clause, it is apparent that the parties intended the Option Agreement to be the final, integrated expression of their agreement concerning stock options. See Amerada Hess Corp. v. Garabedian, 416 Mass. 149, 155 (1993) (absent fraud or mistake, court will enforce an integration clause). “It is difficult to imagine how the parties could have expressed themselves more forcefully” that the Option Agreement constituted an integrated agreement, not to be varied by prior conversation. US Trust v. Henley & Warren Management, Inc., 40 Mass.App.Ct. 337, 341 (1996). As was the case in US Trust v. Henley & Warren Management, Inc., the language of integration and the express disavowal of recourse to prior communications precludes the argument that the Option Agreement is incomplete by virtue of its omission of provisions said to have been previously agreed upon. Id., 40 Mass.App.Ct. at 342.
The parol evidence rule does not, however, preclude evidence of a subsequent modification of a written contract. New England Factors, Inc. v. Genstil, 322 Mass. 36, 40 (1947); Vakil v. Anesthesiology Assoc. of Taunton, Inc., 51 Mass.App.Ct. 114, 120, rev. den., 434 Mass. 1104 (2001). For consideration, the parties to a contract may agree, expressly or impliedly, to modify a written contract, and a provision that an agreement may only be amended by a written instrument does not necessarily bar oral modification. Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992).
It is undisputed that the communications at issue took place before each Option Agreement, in fact, was executed. Nevertheless, the plaintiffs argue that the communications they rely upon to establish that Excel agreed to use their RAScom hire date for purposes of stock vesting constitute a “subsequent” modification of the Option Agreement because they took place after the “as of’ date in the Option Agreement. In effect, it *238 is the plaintiffs’ position that the defendants Eire bound, for all purposes, by the “as of’ execution dates recited in the Option Agreements and that any agreements made after the “as of’ execution dates are subsequent communications for purpose of the parol evidence rule. However, where the date of execution of an agreement is in the nature of a declaration, recital or acknowledgment of existing facts, a party may prove the correct date of execution. “A recital of a fact in an integrated agreement may be shown to be untrue.” Restatement (Second) of Contracts §218(1) (1979). See, e.g., Hindenlang v. Mahon, 225 Mass. 445, 447 (1917) (party may show that contract is void because it was executed on a Sunday and not on the date specified in the contract); Lee v. Massachusetts Fire & Marine Ins. Co., 6 Mass. 207, 219 (1810) (evidence admissible to establish effective date of insurance policy, although date affixed to contract is presumptively true for purposes of coverage); In re Sanner, 218 B.R. 941, 945-46 (Bankr.D.Ariz. 1998) (majority of jurisdictions permit contracting parties to prove date of the agreement where so doing would not alter a vital part of the contract); J.R. Fulton v. L&N Consultants, Inc., 715 F.2d 1413, 1418-19 (10th Cir. 1983) (evidence admissible to show date of execution because agreement that recited it was “made and executed as of’ a particular date leaves the date of actual execution undecided); Meadors v. Pacific Int’l Petroleum, Inc., 449 So.2d 26, 29 (La.App. 1st Cir.), writ denied, 450 So.2d 964 (La. 1984) (actual date of execution admissible in support of plaintiffs defense of incapacity to contract). Compare Joseph v. Bigelow, 58 Mass. 82, 84 (1849) (execution date of promissory note cannot be contradicted because that date determined repayment date).
The plaintiffs rely on two unpublished cases from other jurisdictions. See Prusky v. Phoenix Life Ins. Co., 2005 WL 1754948 at *12 n.6 (E.D.Pa. July 26, 2005) (effective date of insurance policy, not later date when policy was actually signed and delivered, governs for purpose of parol evidence rule); International Marketing Ltd. v. Archer Daniels Midland Co., 1998 WL 1180157 at *3 (D.Or. April 10, 1998) (noting that contract had different effective and execution dates, and using earlier effective date as operative for parol evidence analysis). These cases are not persuasive support for the proposition that an “as of’ execution date governs for purposes of the parol evidence rule where there is a conflict between the “as of’ date recited in an agreement and its actual execution date.
Furthermore, Massachusetts case law consistently refers to the execution of a written agreement, and not to its effective date, as the event that triggers application of the parol evidence rule. See, e.g., Robert Indus., Inc. v. Spence, 362 Mass. 751, 756 (1973) (parol evidence of statements made before “lease was executed” not permitted to vary terms); Burns v. Great Atlantic & Pac. Tea Co., 312 Mass. 551, 553 (1942) (evidence during negotiations not admissible to control interpretation of instrument “as finally drawn up and executed”); Inhabitants of Brookline v. Crane Constr. Co., 285 Mass. 558, 564 (1934) (agreements made prior to “execution” of written contract inadmissible). See also 9 J. Wigmore, Evidence §2425, at 75 (Chadbourn rev. 1981) (discussing theory behind parol evidence rule and noting that integration principle applies once parties draft single document to embody complete agreement and “sign or otherwise adopt” that agreement).
Use of the actual execution date — the date on which the parties have adopted their agreement — and not the “as of’ execution date set out in the agreement furthers the goal of the parol evidence rule, which is to preserve the integrity of the written terms of an integrated agreement once it has been adopted by the parties. See Restatement (Second) of Contracts §214 (1979) (parol evidence rule applies to agreements Emd negotiations prior to or contemporaneous with the “adoption” of a writing). “What a party remembers about what was said ... is easily colored by what that person wished to be resolved by the discussion. The hoped for result metamorphoses into fact. That is why lawyers draw commercial instruments to state as precisely as they can the rights and duties of the parties, and that is why the parties sign those agreements. A judge uses summary judgment for the purpose for which it was intended when ... a party seeks to alter what the agreement provides by saying, in effect, ‘that was not what we meant at all.’ ” US Trust v. Henley & Warren Management, Inc., 40 Mass.App.Ct. at 343 (emphasis added).
The plaintiffs accepted the written Option Agreement as the final expression of their complete agreement when they affixed their signatures; accordingly, the actual execution date is the operative date for purposes of the parol evidence rule. The parol evidence rule precludes the plaintiffs from using any communications prior to the date on which they signed the Option Agreements to establish that Excel is obligated to calculate vesting of their options from the date of their employment with RAScom rather than from the date of their employment with Excel.[8] Accordingly, Excel and Lucent are entitled to judgment as a matter of law on the breach of contract claim insofar as it alleges breach of a promise to credit the plaintiffs for their employment with RAScom for purposes of the vesting schedule.[9]
Grant of Additional Shares to Galvin
Plaintiff Galvin also alleges that Excel breached a contract to grant him an option for an additional 100,000 shares. The promise to grant 300,000 shares was allegedly made shortly before the May 10, 1999 merger between RAScom and Excel. The Option Agreement executed by Galvin in June of 1999 states that it grants him “a maximum of 200,000 shares.” Galvin argues that the matter of the additional 100,000 shares is a separate enforceable agreement to which *239 the parol evidence rule does not apply. The existence of an integrated written contract does not bar proof that the parties contemporaneously made an independent, collateral agreement on a distinct subject, for separate consideration, as long as it does not contradict the written contract. Dixon v. Lamson, 242 Mass. 129, 138 (1922); Brennan v. Carvel Corp., 929 F.2d 801, 807 (1st Cir. 1991). Whether a second agreement is collateral to an integrated agreement is a preliminary question of fact to be decided by the court. Brennan v. Carvel Corp., 929 F.2d at 807. An important consideration is whether the matter is such that it might naturally be covered not by the written agreement, but separately. Cf. Restatement (Second) of Contracts §216 (1979) (consistent additional terms). Here, the additional shares are not a collateral or distinct matter that would naturally be omitted from the written Option Agreement. The Option Agreement is a fully integrated writing that encompasses all the parties’ arrangements concerning the granting of incentive stock options to former RAScom employees. Galvin cannot contradict Excel’s written grant of “a maximum of 200,000 shares” by seeking to introduce evidence of an oral promise prior to the execution date to give him 100,000 more.
Even if Madonna’s second promise in June of 1999 that Excel would issue an additional 100,000 shares at a later date occurred after Galvin’s execution of the Option Agreement, Galvin is not entitled to defeat the defendants’ motion for summary judgment because the record fails to raise a genuine issue of material fact with respect to whether the parties, for valuable consideration, entered into an oral modification of the number of shares. The question of whether the parties have agreed to modify a written contract is one of fact. L.W. Severance & Sons, Inc. v. Angley, 332 Mass. 432, 438 (1955); V.&F.W. Filoon Co. v. Whittaker Corp., 12 Mass.App.Ct. 932, 933 (1981). Mutual agreement or modification of the requirement of a writing may be inferred from the conduct of the parties and from the attendant circumstances, where the evidence warrants such an inference based on probabilities, not mere possibilities. Cambridgeport Sav. Bank v. Boersner, 413 Mass. at 439-41; First Pennsylvania Mortgage Trust, 395 Mass. 614, 624 (1985). In order to create a genuine issue of material fact, “(t]he evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties.” Cambridgeport Sav. Bank v. Boersner, 413 Mass. at 439 n.10.
The only evidence in the summary judgment record with respect to an oral modification of Galvin’s Option Agreement is Galvin’s self-serving testimony that Madonna promised to increase the number of shares after the closing of the Excel/Lucent merger. There is no other evidence, testimonial or documentary, that supports the allegation that Excel agreed to modify the Option Agreement by granting Galvin an additional 100,000 shares. There is, for example, no evidence that the parties’ conduct conformed with the alleged modification, insofar as Excel never acknowledged the existence of such an agreement or granted additional shares, and Galvin himself never demanded any additional shares at the time of the acceleration or at any other time prior to this litigation. Galvin’s correspondence with Excel concerning stock options raised only the issue of the use of the RAScom hiring date and not the number of shares to which he was entitled. Cf. Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 47 (1991) (where parties’ conduct after signing a written agreement conforms with an oral modification, rather than with the terms of the written agreement, it may be inferred that the parties agreed to be bound by the oral modification).
Accordingly, the summary judgment record does not raise a sufficient issue for a jury on the question of a subsequent oral modification. See Cambridgeport Sav. Bank v. Boersner, 413 Mass. at 439-42 (bank entitled to directed verdict on lender’s claim of breach of contract where there was no evidence of conduct by the lender, following the execution of formal loan documents, consistent with an alleged oral modification to pay interest from the loan proceeds, and plaintiffs weak, minimal evidence was insufficient to overcome presumption against modification). Cf. First Penn. Mortgage Trust v. Dorchester Sav. Bank, 395 Mass. 614, 623 (1985) (ample evidence, including telephone conversations and written memoranda, supported claim that amount of construction loan was increased by oral agreement after substantial cost overruns occurred). Thus, the defendants are entitled to judgment as a matter of law on Galvin’s separate breach of contract claim.
II. Breach of Covenant of Good Faith and Fair Dealing
The Second Amended Complaint alleges that Excel and Lucent’s refusal to credit the plaintiffs for their employment with RAScom for purposes of stock vesting breached the covenant of good faith and fair dealing. A covenant of good faith and fair dealing is implied into eveiy contract in Massachusetts. Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). This covenant requires the parties to remain faithful to their intended and agreed-upon expectations concerning contractual performance and prohibits one party from injuring the other’s right to reap the benefits prescribed by the terms of the contract. Id.; Christian v. Edelin, 65 Mass.App.Ct. 776, 778 (2006).
Here-, the plaintiffs’ rights with respect to the vesting of their stock options are limited to those set forth in the integrated Option Agreement and do not include any oral representations made prior to the execution of the contract. Because the defendants acted consis *240 tently with the clear terms and spirit of the Option Agreement, they did not deprive the plaintiffs of the fruits of their contract. See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. at 385 (covenant of good faith and fair dealing cannot be invoked to create rights and duties not otherwise provided for in the existing contractual relationship). Accordingly, the defendants are entitled to judgment as a matter of law on the plaintiffs’ claim of breach of the covenant of good faith and fair dealing.
III. Promissoiy Estoppel
Finally, the plaintiffs seek to recover on a theoiy of promissoiy estoppel. A plaintiff may recover on a theoiy of promissory estoppel by demonstrating that the defendant made a promise which he should reasonably have expected to induce action or forbearance of a definite and substantial character by the plaintiff, that the plaintiff reasonably relied on the promise to his detriment, and that injustice can be avoided only by enforcement of the promise. Loranger Constr. Corp. v. E.R Hauserman Co, 376 Mass. 757, 760-61 (1978). Promissoiy estoppel thus permits a plaintiff to substitute reasonable reliance and detriment for the traditional element of consideration. Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. 841, 849 (1995). However, a parly cannot reasonably rely on a prior oral representation that conflicts with a written contract signed by the parties. Id. at 850 (no recoveiy on promissoiy estoppel theoiy where it was unreasonable, as a matter of law, for business persons to rely on alleged oral promise to make $43 million loan, where parties clearly intended written agreement to govern the intricacies of the deal); Cambridgeport Sav. Bank v. Boersner, 413 Mass. at 442 (reliance on alleged promise by bank to fund interest from loan principal not reasonable where it contradicted clear terms of loan agreement); Coll v. PB Diagnostic Syst, Inc., 50 F.3d 1115, 1124 (1st Cir. 1995) (no recoveiy based on promissoiy estoppel where it was unreasonable as a matter of law for employee to rely on promise made during contract negotiations to give him benefit of long-term compensation plan where executed employment contract set forth detailed benefits but did not mention long-term compensation plan). Here, plaintiffs’ reliance on any promise to credit them for their employment with RAScom was unreasonable as a matter of law given that they later executed an integrated Option Agreement that uses the length of service with Excel as the operative period. Accordingly, the defendants are entitled to summary judgment on the plaintiffs’ promissory estoppel claim.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED and that the plaintiffs’ motion for partial summary judgment be DENIED.

Gieseler was employed as the managing director of RAS-com GmbH, a German company which became Excel GmbH.

This fact is disputed. Stavros contends that when asked whether the RAScom start date would apply to stock options, he responded that it would if stock options were considered an employee benefit. Stavros states that he never understood stock options to be an employee benefit; rather, he considered employee benefits to be matters like health insurance, disability payments, and vacation time.

In a separate Option Agreement effective June 3, 1999, Excel granted Elbeeiy an additional 5,000 stock options.

Where a contract is ambiguous, extrinsic evidence is admissible, not to contradict or change the term of a contract, but to show the background and purpose of the parties and the circumstances in which the agreement was negotiated, as well as the practical construction placed on the agreement by the parties themselves, in order to assist the court in construing unclear language and resolving uncertainties in applying the agreement to a particular subj ect matter. Cullinet Software, Inc. v. McCormack & Dodge Corp., 400 Mass. 775, 776 (1987); Hubert v. Melrose-Wakefreld Hosp. Ass'n., 40 Mass.App.Ct. 172, 177 (1996); USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 116, rev. den., 406 Mass. 1104 (1989).

The fact that Excel’s acquisition of RAScom was a “pooling of interests” transaction under then-effective accounting rules in which the companies’ operating results and financial statements were restated as if they had always been combined does not create an uncertainty in the application of the definition of “Company” in the Plan absent evidence, such as expert testimony, that a pooling of interests transaction results in companies retroactively being deemed one for business purposes beyond accounting, such as the vesting of option benefits.

There is no merit to the plaintiffs’ argument that the communications prior to the date of execution elucidate, rather than contradict, the terms of the Option Agreement because Excel itself interpreted “Company” in Section 22 of the Plan to mean entities other than Excel, as evidenced by the fact that it allowed employees such as Gieseler, Neuhaus and Ryan to accelerate the vesting of their options under the Plan even though they were never employed by Excel but rather by Excel subsidiaries. Section 1 of the Plan authorizes the granting of stock options to officers and employees of “any present or future subsidiaries of the Company (collectively, “Related Corporations”) . . .” Related Corporations are referenced in numerous provisions of the Plan, although not in Section 22. Thus, an interpretation of “Company” in Section 22 that extends vesting to employees of subsidiaries is consistent with the Plan as a whole and does not support the argument that “Company” extends to independent companies acquired by and merged into Excel for purposes of length of employment.

In light of preclusive effect of the parol evidence rule, it is unnecessary to decide whether the breach of contract claims brought by Wood and Parmar are independently barred on the ground that the Option Agreement is one subject to performance on demand because the Stock Option Plan requires the option be exercised by written notice to Excel accompanied by payment. It is undisputed that Wood and Parmar never demanded to exercise their options in any amount and defendants claim that there was no unequivocal repudiation rendering such a demand an idle and unnecessary ceremony. See Barber v. Fox, 36 Mass.App.Ct. 525, 527 (1994). Cf. Kanavos v. Hancock Bank & Trust Co., 395 Mass. 199, 204-05 (1985) (plaintiff seeking damages for breach of stock option contract must show that he was ready, willing and able to purchase stock during the option period).